HAROLD L. PERLMAN *et al.*, Plaintiffs-Appellees, *v.* THE FIRST NATIONAL BANK OF CHICAGO, Defendant-Appellant.

(No. 57436;

First District (1st Division)—November 5, 1973.

Albert E. Jenner, Jr., Keith F. Bode, Chester T. Kamin, and Michael J. Rovell, all of Chicago (Jenner & Block, of counsel), for appellant.

Irving T. Zemans, Harry Kalven, Jr., and Harold L. Perlman, all of Chicago, for appellees.

Mr. JUSTICE EGAN delivered the opinion of the court:

The plaintiffs, Harold L. Perlman, individually and as the controlling member of, and as agent for 1000 Lake Shore Drive, a joint venture, and Continental Sales & Enterprises, Inc. filed a three-count complaint on behalf of themselves and as representatives on behalf of all other persons similarly situated against the defendant, the First National Bank of Chi-

cago, hereafter referred to as "the Bank." Count III was stricken on the Bank's motion.

Count I alleged as follows:

1000 Lake Shore Drive executed and delivered a promissory note dated May 31, 1965, prepared by the Bank for a loan of $1,200,000 providing for interest at the rate of 5% per annum payable semi-annually. On January 12, 1966, 1000 Lake Shore Drive executed a promissory note prepared by the Bank for a loan of an additional $500,000 at the rate of 5½% interest per annum. The Bank at no time before July 15, 1970, disclosed that it had been and was computing interest at a rate higher than 5% or 5½% on the respective notes.

Perlman had been a depositor and customer of the Bank since 1931, who relied on the Bank's reputation for accuracy and trustworthiness and assumed that the interest charges as stated in the notices he received from the Bank were in accordance with the terms of the notes, namely on a per annum or 365-day year basis.

Continental Sales & Enterprises, Inc. and Perlman individually had borrowed sums of money and executed promissory notes in 1963 and 1967 respectively at interest of 5½% per annum.

On July 8, 1970, Perlman, after receiving a notice of interest due, wrote to the Bank questioning the amount. On July 15, Richard K. Charlton, the Assistant Vice-President of the Bank, sent Perlman a letter notifying him that the interest calculation was not a mistake or clerical error; that "divisional term loans" are calculated on the actual number of days on a 360-day year basis, which is the "standard bank basis" and, as far as he knew, "a universal bank practice"; and that he did not feel the Bank could alter the method of interest calculation which had "considerable precedence historically throughout the banking industry."

The Bank had the following amounts of loans outstanding as of the following dates:

| Date | Amount |
|------|--------|
| December 31, 1960 | $1,725,000,000 |
| December 31, 1964 | 2,196,000,000 |
| December 31, 1965 | 2,717,500,000 |
| December 31, 1966 | 2,899,500,000 |
| December 31, 1967 | 3,249,700,000 |
| December 31, 1968 | 3,640,000,000 |
| December 31, 1969 | 4,186,000,000 |
| June 30, 1970 | 4,549,000,000 |

The defendant had been calculating and collecting interest on many of those loans on a 360-day year basis without disclosing the method or

basis to many of the borrowers. Many of those loans were for sums of $100,000 or less, and since the amount illegally collected from some borrowers was small, they could not providently expend the funds necessary to prosecute their claims separately. The plaintiffs on information and belief alleged that many of the borrowers whose loans were in excess of $100,000 had not and would not prosecute their individual claims for collection of the illegal interest charged because they were fearful such prosecution would result in the Bank's refusal to accommodate their financial requirements.

The complaint further alleged that the plaintiffs and the thousands of persons composing the class on whose behalf the relief was sought shared a community of interest in the subject matter and in the relief sought and prayed for a declaration that:

1. The phrase "per annum" or "per year" or "annually" as contained in any promissory note or other instruments of indebtedness evidencing loans made by the defendant Bank to all borrowers upon which interest has been collected for periods of 30 days or more means a year of 12 calendar months consisting of 365 days, except for leap year which consists of 366 days.

2. The calculation of interest, computation of time and interest, and collection of interest on any promissory note or other instrument of indebtedness specifying that interest be paid per annum or per year by a method of using a 360-day year instead of a calendar year of 365 days is illegal and contrary to the provisions of Sections 9 and 10 of the Illinois Interest Statute unless such method is expressly stipulated in the promissory notes or other instruments of indebtedness or otherwise expressly agreed to by the borrower.

In Count II the plaintiffs prayed for an accounting of the amount of interest illegally collected from the plaintiffs and all other persons similarly situated during the 10 years preceding the filing of the complaint; since the Bank had been unjustly enriched by the aggregate amount of interest illegally collected that a constructive trust be impressed on the funds disclosed by the Bank's accounting and that the court direct the Bank to make restitution and refund the illegally collected interest to the persons entitled thereto; that the court appoint representatives for the purpose of supervising and administering the accounting and collection of interest to be refunded by the Bank; and that the court allow reasonable attorney's fees for services of the plaintiffs' counsel out of the funds collected.

In its answer, the Bank admitted that it did and would continue to compute interest on a 360-day basis. It denied that the named plaintiffs

and the persons that they purport to represent were unaware that the Bank was computing interest on a basis of a 360-day year until July 15, 1970; that the Bank had been and was collecting interest without disclosing the standard bank basis of computation; that many of the loans were for $100,000 or less; and that there was a community of interest in the subject matter and the relief sought among the representative plaintiffs and the thousands composing the class on whose behalf the relief was sought.

In addition, the defendant advanced several affirmative defenses. For reasons to be discussed later, we will set them out verbatim:

*"First Affimative Defense*

1. The Complaint fails to state a cause of action.

*Second Affimative Defense*

2. The action was not commenced within five years of the time it accrued to plaintiffs.

*Third Affirmative Defense*

3. According to the longstanding and notorious commercial practice, custom and usage, of which plaintiffs knew or reasonably should have known, notes such as those executed by plaintiffs import the use of a 360-day daily basis for computing interest. Plaintiffs manifested no intention not to be bound by this practice, custom and usage and accordingly agreed to the use of said basis, which was the basis applied by defendant with respect to the notes in issue.

*Fourth Affirmative Defense*

4. For many years prior to filing the Complaint, plaintiffs engaged in a course of dealing with defendant in which plaintiffs severally or in combination executed debt instruments with defendant, received funds and applied them for commercial profit, and paid interest as computed and charged on a 360-day daily basis. For many years prior to filing the Complaint plaintiffs severally or in combination continued to execute further debt instruments in order to borrow funds from defendant and apply them for commercial profit, after plaintiffs had paid interest as computed and charged by defendant on a 360-day daily basis with respect to previously executed debt instruments.

5. Plaintiffs knew or reasonably should have known as of each payment of interest by them that the standard bank practice of a 360-day daily basis was being applied and yet did not seek to negotiate a modification of that practice by express stipulation in the instrument and continued to borrow and apply for com-

mercial profit the funds of defendant. Defendant relied upon the reasonable assumption that a 360-day daily basis of computing interest was applicable.

6. It would be unjust and inequitable to permit plaintiffs and other members of the class they purport to represent now to change their position and contend that a basis other than the 360-day daily basis was applicable. Defendant would be seriously prejudiced by a change from the standard bank basis for computing interest.

7. Plaintiffs have ratified and acquiesced in the conduct and practice of defendant complained of, have waived their cause of action, are guilty of laches and are barred and estopped from maintaining this action.

*Fifth Affirmative Defense*

8. The action is barred by virtue of the National Bank Act (Act of June 3, 1864, c. 106) as amended, and rules and regulations promulgated pursuant thereto."

Only the third and fourth affirmative defenses are in issue before us.

The plaintiffs' reply to the affirmative defenses, in substance, denied that there was a longstanding and notorious commercial practice, custom and usage, and alleged that the " 'standard bank practice' was and is repugnant to and conflicts with notes and other instruments of indebtedness which provide for the computation of interest on a per annum basis and violates the statutes of Illinois"; and that "Defendant's use of the 360-day basis for computing interest was contrary to and inconsistent with the provisions of the notes attached to Plaintiffs' * * * action." The plaintiffs also denied actual or constructive knowledge of the defendant's alleged practice.

After both sides had engaged in some discovery, the defendant filed a motion for judgment on the pleadings seeking a dismissal of the complaint as a class action. The trial judge considered exhaustive briefs and denied the motion. He found that the order involved questions of law as to which there was substantial ground for difference of opinion and that an immediate appeal from the order might materially advance the ultimate termination of the litigation, and we granted defendant's motion for leave to appeal. Ill. Rev. Stat. 1971, ch. 110A, sec. 308.

The defendant's main argument may be summarized:

A trial as a class action would involve thousands of individual claims. Each of those claims in turn would necessarily involve the negotiations between the Bank and the borrowing claimant; and, further, an issue of fact would arise whether each borrowing claimant was aware of the "custom and usage" in the banking business of computing interest on a

360-day basis. The Bank would introduce evidence explaining the circumstances under which the thousands of borrowers executed notes like the one in issue, and the plaintiffs would be permitted to rebut this evidence. Thus, the defendant argues, one trial would, in effect, become thousands of trials, a judicial and administrative burden beyond the power of any judge to bear.

This same argument has been accepted in some cases (*Newberry Library v. Board of Education of City of Chicago*, 387 Ill. 85, 55 N.E.2d 147; *Peoples Store of Roseland v. McKibbin*, 379 Ill. 148, 39 N.E.2d 995; *Rice v. Snarlin, Inc.*, 131 Ill.App.2d 434, 266 N.E.2d 183; *Kuehn v. Bismarck Hotel Co.*, 52 Ill.App.2d 321, 202 N.E.2d 52; *Schick-Johnson Co. v. Malan Construction Corp.*, 49 Ill.App.2d 277, 200 N.E.2d 76); and rejected in others, (*Fiorito v. Jones*, 39 Ill.2d 531, 236 N.E.2d 698; *Rosen v. Village of Downers Grove*, 19 Ill.2d 448, 167 N.E.2d 230; *Harrison Sheet Steel Co. v. Lyons*, 15 Ill.2d 532, 155 N.E.2d 595; *Smyth v. Kaspar American State Bank*, 9 Ill.2d 27, 136 N.E.2d 796; *Johnson v. Halpin*, 413 Ill. 257, 108 N.E.2d 429; *Moseid v. McDonough*, 103 Ill.App.2d 23, 243 N.E.2d 394; *Kruse v. Streamwood Utilities Corp.*, 34 Ill.App.2d 100, 180 N.E.2d 731; *Cook v. Cohn*, 25 Ill.App.2d 330, 166 N.E.2d 614; *Kimbrough v. Parker*, 344 Ill.App. 483, 101 N.E.2d 617). "As is pointed out by the courts and the law writers and commentators, the decisions on this subject are numerous and conflicting and each case must be decided on its own merits." *Kruse v. Streamwood Utilities Corp.*, 34 Ill.App.2d at page 108.

The Interest Act (Ill. Rev. Stat. 1971, ch. 74, sec. 9, 10) provides as follows:

"§ 9. Whenever, in any statute, act, deed, written or verbal, contract, or in any public or private instrument whatever, any certain rate of interest is or shall be mentioned, and no period of time is stated for which such rate is to be calculated, interest shall be calculated at the rate mentioned, by the year, in the same manner as if 'per annum' or 'by the year' had been added to the rate.

§ 10. In all computations of time, and of interest and discounts, a month shall be considered to mean a calendar month, and a year shall consist of twelve calendar months; and in computations of interest or discount for any number of days less than a month, a day shall be considered a thirtieth part of a month, and interest or discount shall be computed for such fractional parts of a month upon the ratio which such number of days shall bear to thirty."

Although the issue of how these sections are to be interpreted is not

before us, we believe that the fact that their interpretation is in issue is pertinent in resolving the question of custom and usage.

As may be seen from the third affirmative defense, the Bank contends that the plaintiffs knew or should have known of a custom and usage that imports use of a 360-day basis for computing interest. The plaintiffs counter that there is no custom and usage; if there was, that they were unaware of it; and that it conflicts with the express terms of the note and violates the statute.

Whether there was a custom or not, the Bank concedes, is a question common to all the parties and could be determined relatively simply at one trial. On the other hand, if there was, we accept the Bank's argument that all of the members of the class would be charged with constructive knowledge of it, that each member of the class should be, and would be, permitted to show that he had no knowledge of the custom; and that potentially thousands of witnesses would appear to testify on this point alone. This plausible argument is susceptible to counter arguments, but we need not discuss them because we conclude that custom and usage is not available here as a defense that would bar a class action.

At this juncture we deem it appropriate to point out that at oral argument this court raised the question of the applicability of the parol evidence rule, and the attorney for the Bank answered that the rule had not been argued in the trial court. It is true that the term "parol evidence rule" was not specifically used in the trial court so far as the record before us discloses, but we believe that the admissibility of custom and usage was before the trial court and has been raised before us.

In the reply to the third affirmative defense, the plaintiffs stated that the "standard bank practice" was in conflict with the note and violated the statute. In the memorandum of law submitted in the trial court the plaintiffs said:

> "Plaintiffs contend, and this is the crux of their grievance, that this use of the standard bank basis in computing interest causes a *sub rosa* increase of 1/72 in the amount of interest; that its use *is in contravention of the terms of their contract with the bank; that it. contravenes §§ 9 and 10 of the Illinois Interest Statutes* * * *. [Abstract p. 194.]
>
> * * *
>
> The pleadings thus put into issue a real and substantial point of controversy between the parties, namely, whether a 'long-standing and notorious commercial practice, custom and usage', such as defendant relies on, does indeed exist *and does in law provide a predicate for reading the 360-day practice into the loan contracts* between the bank and its borrowers when no explicit

mention of the bank's intention is made to the borrowers in any form. [Abstract p. 195.]

\* \* \*

If on the other hand, the named plaintiffs prevail and there is no such custom in fact *or it has no legal validity as an aid in the interpretation of the contract,* then the class will, like the named plaintiffs, prevail." (Abstract p. 196.) (Emphasis added.)

That portion of the Bank's brief dealing with custom and usage (pp. 32-33) cites Williston, Law of Contracts, Section 649; *Ermolieff v. R.K.O. Radio Pictures,* 19 Cal.2d 543; *Steidtmann v. Joseph Lay Co.,* 234 Ill. 84, 84 N.E. 640; and the Restatement of Contracts, Section 246-247. Both Williston at Section 654 and the Restatement at Section 246, point out that "the principle under which incidents are annexed to written contracts by usage is the same as that which controls *the admission of collateral parol agreements."* (Emphasis added.)

In *Ermolieff v. R.K.O. Radio Pictures,* 19 Cal.2d at page 550, in a suit for declaration of rights under a contract, the court said:

"Parol evidence is admissible to establish the trade usage, \* \* \*."

In *Steidtmann v. Joseph Lay Co.,* 234 Ill. at page 88, the court said:

"The testimony of witnesses is admissible to explain \* \* \* words or phrases having a local meaning or a special meaning in a particular calling, trade, business or profession. Such evidence does not contradict or change the written instrument \* \* \*. A person entering into a contract in the ordinary course of business is presumed to have done so in reference to any existing general usage or custom relating to such business."

Although the question of admissibility might have been raised more explicitly, we believe that the reply and memorandum were sufficient to apprise the trial judge, as well as this court, that the plaintiffs were contesting the *validity* of custom and usage as a defense.

■■ Even so, although the trial judge made no findings on specific questions of law, we cannot say that he did not pass on this question. A judgment, however, may be sustained by any argument and on any basis appearing in the record which demonstrates that the judgment was correct, even though such objection or argument had not been advanced in the trial court. (*Shaw v. Lorenz,* 42 Ill.2d 246, 248, 246 N.E.2d 285; *Miller v. Chicago Transit Authority,* 78 Ill.App.2d 375, 223 N.E.2d 323.) Therefore, even if the argument had not been raised in the trial court, since the trial judge's decision perforce found that custom and usage would not bar a class action, it is our duty to search the record to determine if his decision is justified in the law for any reason or ground

appearing therein. Moreover, as noted previously, the Bank's brief puts the issue of admissibility of custom and usage squarely before us.

■■ The general rule provides that "if the terms or provisions of a written contract are in any way uncertain or ambiguous, parol evidence of a custom or usage is admissible to explain them or aid in their interpretation and construction. Where the meaning of such terms is unambiguous and free from doubt, a custom or usage cannot be proved to explain the terms or provisions." (ILP Customs and Usages, § 8; *Ambarann Corp. v. Old Ben Coal Corp.*, 395 Ill. 154, 165, 69 N.E.2d 835; *Fifteenth Ave. Christian Church v. Moline Heat.*, 131 Ill.App.2d 766, 265 N.E.2d 405.) Distinction must be made, however, between construction of a contract and construction of a statute. The law, including statutes, existing at the time and place of the making of a contract is deemed a part of that contract to the same extent as though expressly referred to or incorporated in the contract. (*Goble v. Central Sec. Mutual Insurance Co.*, 125 Ill.App.2d 298, 260 N.E.2d 860.) The contract in this case, therefore, depends upon the interpretation of the statute, and, once the trial court determines the legislative intent as expressed in the statute, the meaning of the contract is clear.

Extrinsic aids in construction of statutes may be considered only when the statute is ambiguous. (*Mid-South Chemical Corp. v. Carpentier*, 14 Ill.2d 514, 518, 153 N.E.2d 72.) Thus, if the trial judge determines that the meaning of sections 9 and 10 of the Interest Act is clear, then, if he interprets the statute as the Bank suggests, proof of custom and usage is unnecessary; and inadmissible, if he interprets it as the plaintiffs suggest, since custom and usage may not contravene a statute. (*Ozier v. Haines*, 411 Ill. 160, 166, 103 N.E.2d 485; *Vermilion County Prod. Credit Ass'n v. Izzard*, 111 Ill.App.2d 190, 196, 249 N.E.2d 352.) If he determines that the meaning is unclear, then he may consider all of the aids of statutory construction, extrinsic as well as intrinsic, but not the custom and usage advanced here.

What this case boils down to is the meaning of "calendar year": Does it mean 365 days, or does it mean 360 days? In oral argument and in its brief, the Bank has made its position clear: The custom and usage that it would invoke applies only to "commercial loans" made by banks. Thus, to accept the Bank's argument, the legislature intended that sections 9 and 10 mean one thing when applied to commercial loans made by banks but quite another thing when referring to mortgages, for example, or to all loans made by entities other than banks. Such a conclusion is manifestly unacceptable. "[I]n order that an alleged trade or commercial meaning of a term shall prevail, it must appear that such commercial meaning is the result of established usage in commerce and

trade, and that, at the time of the passage of the act, such usage was definite, uniform, and general, and not partial, local, or personal." Sutherland, Statutory Construction (4th Edition), Volume 2A, Section 47.31, page 156.

■■ We conclude, therefore, that under no circumstances could the affirmative defense of custom and usage be maintained.

The fourth affirmative defense alleges that the plaintiffs have "ratified and acquiesced in the conduct and practice of defendant complained of, have waived their cause of action, are guilty of laches and are barred and estopped from maintaining this action." Acquiescence is not a separate defense but constitutes an element of laches. (*Reid for use of Fitzpatrick Bros. v. Chicago Rys. Co.*, 231 Ill.App. 58, 80.) The defenses then may be summarized as waiver, laches and estoppel.

■■ Waiver is the intentional relinquishment of a known right. (*Vermilion County Prod. Credit Ass'n v. Izzard*, 111 Ill.App.2d 190, 195, 249 N.E.2d 352.) The elements of estoppel are set forth as follows: "[W]here a party by his statements or conduct leads another to do something he would not have done but for the statements or conduct of the other, the one guilty of the expressions or conduct will not be allowed to deny his utterances or acts to the loss or damage of the other party. *The party claiming the estoppel must have* relied upon the acts or representations of the other and have *had no knowledge or convenient means of knowing the true facts.*" (*Hickey v. Illinois Central R.R. Co.*, 35 Ill.2d 427, 447, 220 N.E.2d 415.) (Emphasis added.) And where silence is the ground of the estoppel it is essential that the party estopped should have knowledge of the facts *and the other party be ignorant of the truth* and be misled into doing that which he would not have done except for such silence. *Elowe v. Superior Fire Insurance Co.*, 307 Ill.App. 569, 580, 30 N.E.2d 959.

■■■ Laches is such a neglect or omission to assert a right, taken in conjunction with the lapse of time of more or less duration, and other circumstances causing prejudice to an adverse party, as will operate as a bar in a court of chancery. (*Freymark v. Handke*, 415 Ill. 360, 114 N.E.2d 349.) Laches will not apply until such time the party against whom the defense is asserted discovered, or should have discovered, the facts; and the delay must be such to work to the disadvantage of the party asserting the defense. *Tarpoff v. Karandjeff*, 17 Ill.2d 462, 470-471, 162 N.E.2d 1.

■■ These were the principles of law within which the trial judge was to consider the facts before him at the time the motion was made. Knowing those principles and those facts, he was required to look into the future and to make his best judgment of the possible course the litigation

would take and what it would entail. In short, he was called upon by the Bank's motion to exercise his discretion, and we should not gainsay his decision unless the record shows a clear abuse of that discretion. Our duty is to place ourselves in the position of the trial judge and to examine the facts as they appeared to him at the time of his ruling to see if there is some valid reason for it. *People v. Garrett*, 115 Ill.App.2d 333, 341, 253 N.E.2d 39.

The order denying the motion shows that he considered "discovery matters." The answers to the plaintiffs' interrogatories disclosed the following: "The Bank did not make a practice of disclosing to the borrower that it intended to use the 'standard bank basis' * * *. In certain instances it is believed there may have been conversations between officers of the Bank and borrowers which included discussion of the 'standard bank basis' * * *." "The Bank did not direct its employees to disclose to a prospective borrower that interest would be calculated and collected on the 'standard bank basis' where the borrower's note or other evidence of indebtedness did not expressly so provide * * *." "The Bank did not direct its employees to disclose to a prospective borrower that interest would be calculated and collected on a 'standard bank basis' because the 'standard bank basis' was a part of the applicable practice, custom and usage. No disclosure of the Bank's intention was necessary or appropriate." No disclosure was ever made to the plaintiffs before July 15, 1970, that the Bank either intended to or was computing interest on the loan using its standard bank basis, "except as might be implied in the notes themselves and bills for interest sent to plaintiffs by the Bank, which speak for themselves." The "standard bank basis" was never publicly disclosed, announced, or explained by the Bank in advertisements, in newspapers, radio spot announcements, television spot announcements, any written documents prepared in the ordinary course of business and mailed to the Bank's general mailing list or to its borrowers, nor any form of document given to prospective borrowers at any time prior to "closing" a loan.

In *Young v. Illinois Athletic Club*, 310 Ill. 75, 83-84, 141 N.E. 369, the lessor had paid income tax on rentals for two years. She contended that the lease provisions required the lessee to pay such taxes and sued for the amount she had paid. The court construed the terms of the lease to mean that the lessor should pay. The lessor argued further that, since the lessee had paid the tax for a number of years, the lessee was estopped to deny liability. The court held, in rejecting the argument, that the courts will enforce an instrument in accordance with its plain language, regardless of the construction put upon it by the parties.

The following language of *Holcomb v. Boynton*, 151 Ill. 294, 300, is appropriate:

"It is a novel idea in the law of estoppel that the doctrine should be applied to a person who has been guilty of no fraud, simply because, under a misapprehension of the law, he has treated as legal and valid an act void and open to the inspection of all. As we understand the doctrine of estoppel *in pais*, it is based upon a fraudulent purpose and a fraudulent result. Before it can be invoked to the aid of a litigant, it must appear that the person against whom it is invoked has by his words or conduct, caused him to believe in the existence of a certain state of things and induced him to act upon that belief. If both parties are equally cognizant of the facts, and one has acted under a mistaken idea of the law, the other party cannot say he has been deceived thereby, and is entitled to an application of the rule, but will be considered as having acted upon his own judgment solely."

And in *Malloy v. City of Chicago*, 369 Ill. 97, 104, 15 N.E.2d 861, the court said: "An estoppel *in pais* is available only to prevent injustice. It is a shield, not a sword."

Not only is it doubtful that the Bank can show how the plaintiffs had knowledge of the facts other than by the bills that they paid, but it is certain that the Bank did have knowledge of the facts. Acceptance of the argument of the Bank would indeed be a strange twist of the law that would permit the party with knowledge of the facts to estop the party without knowledge.

The probability of establishing waiver is virtually nonexistent since the record is devoid of any facts which would show an *intentional* relinquishment of a known right.

■■ For these reasons we conclude, based on the record before us, that the defendant could not establish waiver or estoppel.

To prove laches the Bank must show that the facts were known or should have been known by the plaintiffs and that the delay worked to the Bank's disadvantage. As noted in the discussion of estoppel, it appears that the only way the Bank apprised the borrowers was by informing them of the amount of principal unpaid, of interest due, and the period for which interest charges were made. Whether this would be sufficient notice and whether the delay worked to the detriment of the Bank are questions of fact which are common to the plaintiffs and all other members of the class and the determination of which could be made in a single trial.

This is not to say, of course, that this record clearly shows that none

of the borrowers had notice. The Bank's answer to Interrogatory 37 is equivocal: "In certain instances, there may have been conversations between officers of the Bank and borrowers with respect to methods of computing interest which included discussion of the standard bank basis." If the Bank can show notice to any borrower, it may do so. What we are saying is that the number of such borrowers, at best, would appear to be small. As was said in *Harrison Sheet Steel Co. v. Lyons*, 15 Ill.2d 532, 538, 155 N.E.2d 595:

> "[T]he hypothetical existence of individual issues is not a sufficient reason to deny the right to bring a class action. Where it appears that the common issue is dominant and pervasive, something more than the assertion of hypothetical variations of a minor character should be required to bar the action. [Citations.] The company's opportunity to defend any individual issues that may arise will not be impaired, and it can hardly be said that it will suffer greater inconvenience by litigating those issues in a single action instead of in separate actions."

See also *Rosen v. Village of Downers Grove*, 19 Ill.2d 448, 456, 167 N.E. 2d 230.

■■ The brief of the Bank states that "Perlman admitted that his accountants had advised him of the existence of the 360 day basis several years before the commencement of these proceedings." The deposition of Perlman is not abstracted, nor is it part of the report of proceedings. But, if the Bank is able to show that Perlman did in fact know that the Bank was using the "standard bank basis," then his personal cause of action would fall, and, consequently, so would the entire class action. (*Janes v. First Federal Savings & Loan Ass'n of Berwyn*, 11 Ill.App.3d 631, 297 N.E.2d 255; *DePhillips v. Mortgage Associates, Inc.*, 8 Ill.App. 3d 759, 764, 291 N.E.2d 329.) For these reasons we conclude that the trial judge did not abuse his discretion in holding that laches would not present an insuperable obstacle to his management of an orderly trial.

Moreover, as we have pointed out, the trial judge was called upon to make a judgment based on the facts before him at the time. This does not mean that he locked himself in a judicial and administrative strait jacket. If the course of the trial reveals the Bank's argument is well founded, he has the right to reverse his position and to take such corrective action as the situation would require.

■■ The Bank also contends that the class action cannot be maintained because of the absence of a common fund or res. The notion has apparently arisen, and the Bank argues, that the term "fund" as used in class actions means a sequestered sum of money, easily identified and computed. We have found no precedential basis for such a conclusion. Its

genesis seems to be *Peoples Store of Roseland v. McKibbin,* 379 Ill. 148, 39 N.E.2d 995. In that case the trial court enjoined the State Director of Finance from collecting certain taxes, ordered an accounting of taxes already collected and issuance of credit certificates, ordered that all members of the class who appeared with their own attorneys pay 20% of any money they recovered to the plaintiffs' attorneys, and enjoined all other members of the class not parties to the proceedings from instituting any action in their own behalf.

It was that portion of the order enjoining other members from instituting their own actions to which the Supreme Court addressed itself. (Count III of the complaint before us, which was stricken, sought the same type of injunction.) Pointing out that the right of recovery was purely statutory and each individual was required to submit his own proof that he had complied with the statutory requirements, the court said at page 154:

"In the instant cases all retailers of the State engaged in selling food supplies to institutions of the kind and character to which plaintiffs sold have an interest in having such sales exempted from the tax but the common interest stops there. A decision sustaining their view that no tax is due on such sales *does not create any fund* from which reimbursement can be made, neither does it establish the existence of a right of recovery in every vendor. Each must make proof as required by section 6 as amended, and in doing so he resorts to his own sales which are wholly independent and unrelated to the sales made by others engaged in the same business and selling to similar institutions. The money wrongfully collected as a tax and held by the State officials is not to be considered as *one fund* for the benefit of all who had paid taxes which should not have been paid, but the interest of each taxpayer is limited to his own sales. If the plaintiffs, or any of those whom they seek to represent as a class, paid taxes which should not have been paid, then the money in the hands of the defendants was derived from distinct, separate transactions which each vendor had with the institution to whom they had sold. [Citation.] It is clear that these suits can not be maintained as class suits and the statement in the stipulation that they are class suits can not operate to give the court jurisdiction over those persons whom plaintiffs undertook to represent and who are not before the court." (Emphasis added.)

There is no pronouncement that a sequestered sum of money is required. It is reasonable to say that the result of *Peoples Store* would have been the same even if the sequestered sum of tax money improperly collected

had been in existence. Moreover, the case, as a support of the defendant's position, is undermined because the right to recover has been denied at law when claims were made against the State but the appropriations available to pay the claims had lapsed. See. *People ex rel. Brinkerhoff v. Swigert,* 107 Ill. 494.

Some later cases have cited *Peoples Store* and pointed to the absence of a common fund, *among other facts,* as a basis for denying class action relief. (*Newberry Library v. Board of Education of City of Chicago,* 387 Ill. 85, 55 N.E.2d 147; *Reardon v. Ford Motor Company,* 7 Ill.App.3d 338, 287 N.E.2d 519.) In *Reardon,* in which the class action essentially consisted of 4,000,000 separate products liability claims, the court interpreted *Peoples Store* to require a common fund but added at pages 344-345:

> "We do not deem it to be mandatory that there be *in esse* a common fund in every instance if a class action is to be sustained for we are aware of the many cases where such an action was permitted in the absence of such a fund."

Other cases have referred to the existence of a common fund, *together with other facts* in upholding class actions. *Harrison Sheet Steel Co. v. Lyons,* 15 Ill.2d 532, 155 N.E.2d 595; *Smyth v. Kaspar American State Bank,* 9 Ill.2d 27, 136 N.E.2d 796; *Kimbrough v. Parker,* 344 Ill.App. 483, 101 N.E.2d 617.

*Peoples Store* has been distinguished in at least two cases. (*Moseid v. McDonough,* 103 Ill.App.2d 23, 243 N.E.2d 394; *Cohon v. Oscar L. Paris Co.,* 17 Ill.App.2d 21, 149 N.E.2d 472.) In *Moseid,* the court said that the existence of a common fund was one factor to be considered in determining whether there was a community of interest in the subject matter and remedy. It also pointed out that in *Peoples Store* "none of the purported class members there, with the exception of the [plaintiffs] in each suit, had paid any money under the section relating to payment under protest; so the taxes on which refunds were sought had been turned over to the State Treasurer without restriction and deposited in the general fund of the State of Illinois." The *Cohon* opinion, which will be discussed later, held that *Peoples Store* was factually inapposite.

No case, however, has said what the Bank contends: that the common fund must be a segregated sum. There seems no basis in law or logic for permitting a class action against an individual who has sequestered all money wrongfully acquired but denying one against an individual who has commingled it with his other assets.

Accepting, for the sake of argument, the requirement of a common fund, the question to be determined then is whether any fund exists in this case and, if so, how it was created and of what it consists. In one

of the earliest cases dealing with creditor suits against bank shareholders, the court spoke of "common funds" but held that "The liability constitutes a fund." (*Eames v. Doris,* 102 Ill. 350, 357.) In *Queenan v. Palmer,* 117 Ill. 619, 626-627, the court said:

> "Undoubtedly the law is, where a common fund exists upon which numerous persons have claims, equity will seize hold of it, and pay it out ratably upon their respective claims, or pay them in full, if the funds shall be sufficient for that purpose, in cases where it is wrongfully withheld. It may not be always known in advance whether the common fund will be sufficient to satisfy all demands upon it, and to ascertain that fact is a well recognized head of equity jurisdiction. *Treating the liability the statute creates upon the stockholders in this bank as a common fund,* out of which depositors may be paid, as well as out of the assets of the bank itself, the jurisdiction of a court of equity to seize such fund, and control it for the benefit of depositors, would hardly be questioned where an exigency arises that demands the exercise of such power." (Emphasis added.)

And on page 628:

> "That it is the correct construction of the charter *that the responsibility imposed upon stockholders is primary,* and exists with the obligation of the corporation itself, *and that it constitutes a common fund for the benefit of depositors or others  *  *  *.*" (Emphasis added.)

Later cases involving, as here, unjust enrichment claims have followed the same principle: The liability or wrongdoing creates the fund, and whatever is taken wrongfully constitutes the fund.

In *Cohon v. Oscar L. Paris Co.,* 17 Ill.App.2d 21, 149 N.E.2d 472, the defendant successfully sued the Director of Revenue, who was required to refund taxes illegally collected from the defendant, who in turn had collected the tax as a separate item from his customers. After the ruling the defendant continued to enumerate the tax as a separate charge, and the plaintiff was one of the customers who was charged with the tax after the ruling. The court held that the tax money which was returned to the defendant was money that did not belong to him but to the purchasers who had paid it; that there was no reason to distinguish the amount of money collected subsequent to the ruling from that collected before it; and upheld the imposition of a constructive trust on both sums.

In *Hagerty v. General Motors* (1973), 14 Ill.App.3d 33, the plaintiff filed a class action alleging that the defendant had wrongfully charged a tax. The trial court granted the plaintiff's motion for judgment on the

pleadings individually but struck the class action allegations, apparently because of the absence of a common fund. The Appellate Court reversed both orders and remanded on the grounds that an evidentiary hearing was required. To the defendant's argument that the tax money was no longer in its possession and consequently could not be impressed with a constructive trust, the court said:

> "A constructive trust comes into being immediately upon the happening of the circumstances that give rise to the remedy of restitution. (Scott on Trust, § 462.4.) Thus, in the case at bar, a constructive trust arose, if at all, immediately upon the happening of the events whereby defendant received and retained any excess taxes it collected.

> Defendant argues that, even if it was at one time chargeable as constructive trustee, it is no longer so chargeable since it no longer has possession of the taxes it collected from plaintiff and the class. In support of this argument, defendant cites the Restatement of Restitution, § 160, comment i., which provides: '[A] constructive trust no longer continues when a person chargeable as constructive trustee no longer holds the property or other property which is its product.' The cited comment notes that there can be no constructive trust absent a res. Defendant contends that, at the time the instant action was filed, it had transferred to the State the money collected by it from plaintiff as use tax. Since this money, to the extent to which it exceeded the use tax properly collectible from plaintiff was the res of the constructive trust there could no longer be any constructive trust at the time of the suit. We hold, however, that defendant has not transferred to the State the money collected as use tax from plaintiff. What it has done is to pay its own occupation tax with its own funds and has retained the money collected as use tax as it is permitted by Statute to do. *The retained money, to the extent that it exceeds the amount of use tax authorized to be collected, is the res of the constructive trust.*" (Emphasis added.)

If the Bank has been unjustly enriched by charging more than it legally could, we see no distinction between this case and the *Cohon* and *Hagerty* cases. Indeed, the plaintiffs here would be in a stronger position than in *Hagerty*, since there is no suggestion that the Bank passed the money on to a governmental body under an invalid law, or otherwise.

■■ Therefore, it is our opinion that, if the Bank has exceeded the terms of the contract, by doing so it has, in fact, created a fund which consists of the amount of money wrongfully withheld.

■■ Last, the Bank argues that the plaintiffs cannot adequately repre-

sent all the members of the class. First, there is one dominant and pervasive issue: the interpretation of the statute, which is applicable to all. Second, the class embraces only those persons who did not have knowledge of the standard bank basis, including the named plaintiffs. These two issues having been resolved only simple accounting procedures remain to determine the identities and rights of all members of the class. In other words, the rights of the class are coextensive with the rights of the named plaintiffs except for the amounts of the notes, and the relief due the class rises or falls with the fortunes of the named plaintiffs. Under these circumstances a lack of diligence and skill exercised by the plaintiffs on behalf of the class may not reasonably be anticipated. In this regard, we note the argument of the Bank that a ruling by the trial court that any individual had notice of the standard bank basis would be *res judicata* and bar any claim that individual had. The class in this complaint is explicitly restricted to only those persons who did not have notice and was meant to exclude all others. Proof that an individual had notice would simply remove that person from the class but would not necessarily bar any claim he might wish to bring individually or on behalf of all others who did have notice. To illustrate, in *DePhillips v. Mortgage Associates, Inc.*, 8 Ill.App.3d 759, 291 N.E.2d 329, the class suit was brought on behalf of certain mortgagees seeking to restrain the defendant from foreclosing because of the mortgagees' refusal to pay a purported illegal interest increase. The Appellate Court concluded that any party who voluntarily executed the amendment to the mortgage and note would not be considered a member of a class similarly situated to the plaintiff and would not be entitled to the relief sought. In *Kimbrough v. Parker*, 344 Ill.App. 483, 101 N.E.2d 617, the suit was on behalf of a class alleging that the defendant had defrauded them. The judgment was entered against the defendant "in favor of all of the contestants contributing monies." The judgment order was modified by the Appellate Court because it included even parties that had not been defrauded. In *Cook v. Cohn*, 25 Ill.App.2d 330, 334, in a factual setting identical to the *Cohon v. Paris* case, previously discussed, the trial court found that the class consisted of persons who had paid "a price plus an additional amount, as a separate item *or otherwise*." (Emphasis added.) The Appellate Court modified the decree so as to include in the class suit only those who paid the tax "as a separate item." There is no reason why a decree could not be framed in this case that would include only borrowers who did not have notice and exclude those who did.

The only cases called to our attention involving the validity of a class action contesting the "standard bank basis" are *American Timber and Trading Company v. First National Bank of Oregon*, 500 P.2d 1204 and

*Koos v. First National Bank of Peoria, Illinois,* 358 F.Supp. 890. In *American Timber,* the Supreme Court of Oregon upheld the dismissal of the complaint on the sole ground that the suit was an action at law and that class actions could only be maintained in equity and said at page 1208:

> "Because of our conclusion that there is no such thing as a class action in Oregon, it is unnecessary for us to decide whether the allegations of plaintiffs' complaints would sufficiently state such an action."

In *Koos,* the District Court said at page 891:

> "Pursuant to Rule 23(c) (1), F.R.Civ.P., the court at this time concludes that this action is not maintainable as a class action. The prerequisites set forth in Rule 23(a) have not been satisfied. Plaintiffs' claims here, involving transactions possibly excepted from the usury provisions, involve atypical claims on the general proposition of possible usury arising from computation of interest on a 360-day year. Further, under the circumstance here that plaintiff has pledged security in the form of savings and loan shares and life insurance cash values, there is nothing to indicate that those similarly situated would be so numerous that joinder of all would be impracticable."

We agree with the Bank's argument that Federal Rule 23 is not the guideline for Illinois courts in determining the propriety of class actions.

The only other reported case, cited by the plaintiff, involves the same two litigants in *American Timber and Trading Co. v. First National Bank of Oregon,* 334 F.Supp. 888. That case was a class action alleging that the standard bank practice violated the usury laws of the State of Oregon. The District Court granted summary judgment for the plaintiff holding that per annum means 365 days and not 360. It then certified that question for appeal and retained the class action aspect of the case pending the appeal, which we have been informed is still pending. As can be seen, that case took a procedural path diametrical to that taken in this case. None of the cases provides a precedential guideline of any assistance.

For the foregoing reasons, we conclude that the trial judge did not abuse his discretion in denying the defendant's motion for judgment on the pleadings. The order is affirmed.

Order affirmed.

BURKE, P. J., and GOLDBERG, J., concur.