KLIMOCK MEDICAL CORPORATION, INC., Plaintiff-Appellant, *v.* KATHERINE SHAW BETHEA HOSPITAL, Defendant-Appellee.

Second District (2nd Division)   No. 75-202

Opinion filed May 11, 1976.—Rehearing denied June 2, 1976.

Donald A. Manzullo, of Fearer & Nye, of Oregon, for appellant.

Keegan & Gosdick, of Rockford, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Lee County in favor of the defendant hospital in an action on a contract. The plaintiff, · Klimock Medical Corporation, is a wholly owned corporation, organized by Doctor Klimock to operate the hospital's medical laboratory as an independent contractor, and will hereinafter be referred to as Klimock. The contract between Klimock and the hospital was entered into on April 1, 1971, effective June 1, 1971, and provided that the hospital would engage the services of Klimock "to direct the Department of Pathology" and to "assume the responsibility for the proper conduct of the Department and to devote its best ability and such time as is necessary to provide adequate pathology service." In return the hospital agreed to provide space, equipment, utilities and services for the operation of the laboratory as well as technical and clerical personnel. As remuneration for the responsibility assumed and the work to be performed by Klimock the hospital agreed to pay Klimock 35% "of gross laboratory charges" received by the hospital.

The contract provided that the payment of the amount due Klimock would be made monthly and that the hospital would render "a statement of account of the laboratory charges at the time of payment." It also provided that Klimock had the right to examine the books of the hospital relating to the income of the Pathology Department at any reasonable time or place. Klimock was guaranteed at least $65,000 per year from laboratory fees. Klimock actually received considerably more. Either party could terminate the agreement by giving 60 days' written notice prior to the anniversary date thereof.

At the time the contract was entered into, the hospital administrator was one Agnes Florence who left the employ of the hospital shortly thereafter. She testified that the contract had been prepared by the hospital initially but had been submitted to and somewhat changed by Klimock's attorney. However, neither she nor Dr. Klimock recalled any discussion between them as to the meaning of the phrase "laboratory charges." All records were kept by the hospital and a report was given to Klimock once a month as to the number and kinds of tests performed by Klimock during the month. These reports, however, did not indicate the amount of money involved either in total or by categories. The hospital once a month issued a check payable to Klimock showing on the check stub the total amount of laboratory fees for that month and indicating an amount based on 35% of such total as being the amount of the check to Klimock. Beginning in September, 1973, the hospital changed its accounting records to a computer system and thereafter the reports were

on a computer "print-out" sheet. So far as the testimony indicates no further breakdown as to the fees earned was ever requested by Klimock.

After the contract had been in force some 18 months the hospital incorporated another clinic into its operation known as the Medical Arts Clinic. This clinic was a continuation, under a new name, of a clinic formerly known as "Murphy Clinic," which was operated by a Dr. Murphy and several associates and which the hospital had been using for some years previous to and during the first 18 months (approximately) of the Klimock contract. There were several doctors in this clinic originally but after it was located at the hospital the clinic was owned by the hospital, the employees of the clinic were hospital employees and the doctors who operated the clinic were under contract and received a percentage of the revenues of the clinic from the hospital. The administrator of the hospital testified that the Medical Arts Clinic and Klimock did not serve the same patients and were noncompetitive since Klimock served *hospital* patients (both "in" and "out" patients) whereas the new Medical Arts Clinic only took care of patients who were not, for one reason or another, admitted to the hospital either as an inpatient or an outpatient.

After the contract had been in force for almost three years, about "the first of the year" in 1974, the hospital administrator had a conversation with Dr. Klimock in which he told the doctor that the hospital was considering putting all the EKG tests into another department of the hospital for administrative reasons. Dr. Klimock questioned whether this would reduce his revenues, to which the administrator replied that it would not reduce his revenues because Klimock had never received any fees from EKG tests under the contract or at any other time. Klimock testified that it was at this time that he became aware that he had not been receiving any fees for EKG tests performed in his laboratory. It should again be noted that during all of this time Dr. Klimock was furnished with monthly reports and had the right, pursuant to the contract, to "examine the books of accounts relating to the income of the department at any reasonable time or place."

Whether as a result of this conversation or for other reasons the contract was not renewed at its anniversary date, June 1, 1974. Thereafter, Klimock commenced suit against the hospital for an accounting for money due and owing under the contract, being specifically 35% of (a) the amount represented by all EKG fees received by the hospital, (b) all fees received by the Medical Arts Clinic, and (c) certain miscellaneous tests, some blood tests and outside laboratory fees, the total fees in question, according to the stipulated testimony, amounting to $269,472. There was testimony that the amounts actually paid to Klimock under the contract

for the three years from June, 1971, to June, 1974, were over \$368,000. The additional amount of fees claimed amounted to some \$94,000. The case was tried without a jury and resulted in judgment in favor of the plaintiff for only \$21, being 35% of an item of \$60 for "anti-body identifications" for which the court found Klimock had not been paid.

In this appeal Klimock contends the court erred (1) in holding that the items for which claim was made, that is the EKG tests, the Medical Arts Clinic fees and the miscellaneous outside laboratory tests, including blood test work were not intended by the contract to be included as "gross laboratory charges," compensable under the contract, and (2) in recognizing the defense of estoppel based on the testimony adduced and the accounting exhibits.

The plaintiff points out that Agnes Florence, the administrator of the hospital at the time the contract was entered into, testified that it was her opinion that EKG tests were laboratory tests and that she thought the commission was being paid to Klimock on EKGs prior to her being subsequently informed otherwise. It is contended by Dr. Klimock that since the administrator assumed such fees to be included as laboratory fees and Klimock so intended, that there was a meeting of the minds and there is no question which can be raised as to the intention of the parties to the contract.

However, Miss Florence's testimony was simply that the subject of EKG tests or any other particular tests had not come up for discussion during the negotiations, nor had the parties ever definitely defined the term "laboratory charges." She testified that at the time the contract was entered into she had been under the impression that Dr. Klimock's predecessor had been paid a fee for EKG tests and during the short time she had been at the hospital following the signing of the Klimock contract—about three months—she had not realized that no payments were being made to Klimock for EKG tests. She further testified that she afterward learned that the previous pathologist had never been paid for EKG tests. Asked in what category she would put EKGs, Miss Florence answered, "At that time [during the contract negotiations] I thought we were paying for the taking of EKGs." Asked the question, "But, the EKG itself would be a laboratory procedure?" she answered, "We still weren't paying for it." And, asked a further question, "But it was still a laboratory procedure was it not in your opinion?" she replied, "Well, there is some question about that, some hospitals consider that it is and some don't."

Considering that the hospital had never paid the previous pathologist a fee percentage for EKGs and did not at anytime pay or give any evidence of intending to pay a fee for these tests, we cannot conclude that Miss Florence's testimony as related above was sufficient to establish such an

intention on the part of the hospital, as is contended by the plaintiff. It appears from all the testimony that on this point there was simply no meeting of the minds.

Indeed, it is not at all clear that Dr. Klimock himself was of the opinion that EKG tests were covered under his contract at the time it was entered into. Some question has been raised as to a possible estoppel against Klimock based on his silence as to any other intepretation than what the hospital was putting on the contract. The hospital contends that since Klimock was getting reports monthly, this should have been sufficient to alert him to the discrepancy betweeen his actual payments from the hospital and his purported understanding of what he was entitled to; he should be estopped after some 32 months from claiming compensation on the basis he has here contended for, since had he spoken out sooner the discrepancy would have been revealed and the question would have been resolved before the sum involved assumed serious proportions.

■■ We are of the opinion, however, that while the silence of the plaintiff over a period of over 30 months may reflect on the question of the intent with which the contract was entered into, the circumstances are not such as to invoke the equitable doctrine of estoppel. We believe it is generally held that where mere silence is the ground of estoppel the party being estopped must himself have had knowledge of the true facts and failed to act on them, in order to be estopped. (*Perlman v. First National Bank*, 15 Ill. App. 3d 784; 28 Am. Jur. 2d *Estoppel and Waiver* §53 (1966).) As noted above, however, the plaintiff's silence may be a factor to be considered in ascertaining the intention of the parties.

■■ The trial court ruled that the phrase in the contract "gross laboratory fees" was not so clear and unequivocal, that is, so far from containing an ambiguity, as to preclude the taking of evidence on the question of custom and usage to explain it. Accordingly, the hospital was allowed to introduce into evidence the testimony of the hospital administrator of a hospital in Sterling, Illinois. This administrator had some 25 years of experience in several hospitals. In response to a question as to payments to pathologist of fees for EKG tests, he testified that in his experience no fees had been paid to the pathologists for EKG tests—part of the fee was paid to the cardiologist and the balance went to the hospital. It was also established by testimony that in the case of the defendant hospital, $5 of the $15 EKG fee was paid to the cardiologist who read the EKG tests and the rest went to the hospital to defray the cost of equipment, administration, depreciation, etc.

While the intention of the parties cannot be ascertained from only one of the parties it is pertinent to observe that the testimony of Dr. Klimock and the chief laboratory technician revealed that Dr. Klimock was not a cardiologist and that he did not read the EKG tests. Neither did he

administer the EKG tests nor train the personnel who gave them. This was done by the chief laboratory technician. In other words, all work on EKGs was done by an outside cardiologist and the hospital technician. Dr. Klimock's function in these tests was nil except as he claimed a part in the tests as director of the laboratory. As bearing on the hospital's intention, therefore, in connection with the payment to Klimock for EKG tests it is apparent that the hospital never intended to pay for them because (1) they had never paid the previous pathologist and it was not the custom for hospitals to do so; (2) it would have been economically unfeasible to pay a commission on EKGs because of the nominal fee and the necessity of paying the cardiologist to read them, as well as supplying and maintaining the expensive equipment required; and (3) there was no function for the pathologist to perform in that connection and he in fact performed none.

Looking at the question of intent from the standpoint of Dr. Klimock it should also be noted that it was not until he learned that his contract would not be renewed that he definitely claimed a right to 35% commission on all EKG tests as well as on the fees for the Medical Arts Clinic and for certain work and outside blood tests and functions. While he was advised in January, 1974, that he was mistaken in thinking he was being paid a commission on EKGs it appears that it was not until after he had been advised that the contract would not be renewed that he asserted that the contract entitled him to such payment. The amount involved was very considerable—35% of $269,000—and while it must be conceded that the reports given to Klimock by the hospital were not broken down in dollars and cents for each category, it is far from clear that Dr. Klimock believed during all this time that he was entitled to compensation from all these sources. It appears more likely under the totality of the circumstances that he had no clear-cut opinion and that since he was actually receiving some $10,000 per month (that is, some $368,000 over the period of the contract), he was satisfied with the contract as it was being administered by the hospital. At least we cannot discern from his conduct that he actually believed the contract included a commission either on the EKGs or on any part of the revenue of the Medical Arts Clinic prior to the time he was informed that the hospital would not renew the contract. In testifying as to certain computer "print-out" sheets giving detailed information as to laboratory work performed during each preceding month which Dr. Klimock claimed did not come to his attention until March, 1974, he said:

> "I was never aware of their existence—I just learned now, I guess I did learn afterwards that they were out since September, 1973, I don't recall for sure, but the first that I knew of the existence of those computer print-outs was *after, I believe, the hospital told me they were not going to renew my contract and I wanted to delve into exactly what they owed* me when I found out from the

Administrator that they were not paying me for the EKGs, and I asked the Chief Tech for information as far as that goes and he brought to my attention the existence of those computer print-outs, they were all sitting in a drawer at the other end of the laboratory, that is when I first become aware of them." (Emphasis added.)

Thus, it appears that Klimock's contention that he was entitled to a commission on all EKG tests and that he was also entitled to a commission on all the Medical Arts Clinic's work did not become an issue until after he was told his contract with the hospital would not be renewed. While there was testimony that in a conversation in January, 1974, Klimock first learned he was not being paid for the EKG tests, there is no indication that a serious issue was made of this until after he learned in March, 1974, that the contract would not be renewed.

The contract was a lucrative one from Klimock's standpoint, producing some $368,000 in fees over a three-year period, even as interpreted by the hospital, and he seems to have been content with it during the time its fruits were available to him. The construction of the contract now contended for—calling for an additional $94,000 in fees and arising only after the termination of the contract was imminent—is unpersuasive under the circumstances as to the original intention of the contract regarding EKG fees.

Klimock's claim for 35% of all fees arising from the operation of the Medical Arts Clinic is again based on a literal interpretation of the phrase "gross laboratory fees." It is his contention that since the hospital operated the Medical Arts Clinic its fees are to be considered as gross laboratory fees of the hospital, hence subject to his 35% commission. However, uncontradicted testimony by the chief technician of the laboratory indicates clearly that Dr. Klimock was not greatly disturbed by the establishment of the Medical Arts Clinic when it occurred and that he accepted the hospital adminstrator's assurance that the clinic would not affect his laboratory revenue. The Medical Arts Clinic was clearly a separate and independent operation deriving its revenues from clinic patients who had been under the care of the doctors who operated the clinic when it was a separate entity known as Murphy Clinic. Since Klimock had no responsibility in connection with this clinic and it was not designed to deprive the hospital laboratory of any revenue arising from the hospital inpatients and outpatients, and since its existence was acquiesced in by Klimock after initial objection, the present claim for commissions on all its fees is not consistent with the conduct of either of the parties. The establishment of the clinic was not contemplated at the time of the original contract but since Dr. Klimock had no responsibility for it and no duties to perform at the clinic and since he apparently

accepted it as being noncompetitive it would be farfetched to regard its establishment as a violation of the original intent of the contract.

The claim for fees for certain "outside" services in connection with the supplying and adminstering of blood and the performance of blood tests was denied by the trial court simply as not being such laboratory work as was contemplated by the parties, since those functions produced no revenue for the hospital but were "pass-through" items for which the hospital only charged the patients what it cost the hospital. The court reasoned that it had not been within the contemplation of the parties to pay the pathologist a fee on these items and it was not the custom to do so since commission could not reasonably be paid where there was no revenue out of which to pay it. This seems a reasonable construction of the contract.

While Dr. Klimock's silence, therefore, based on a claimed ignorance of the true facts, would not invoke an estoppel against him, it certainly has some bearing in resolving the intent of the parties to the contract. Since there was no "spread" between the cost of the EKG tests and the charge to the patient and both precedent and logic indicate no intention on the part of the hospital to pay such commission, and since the equivocal silence of Dr. Klimock establishes nothing to the contrary, we are inclined to agree with the trial court, which found that such payment was not within the contemplation of the parties, either initially or as it was actually interpreted by their conduct.

The judgment of the circuit court of Lee County is therefore affirmed.

Judgment affirmed.

T. J. MORAN, P. J., and DIXON, J., concur.