No. 47,917

IRL SHUTTS, as Executor of the Estate of Althea Shutts, Individually, and as a representative of all that class of gas royalty owners under Phillips Petroleum Company oil and gas leases in the Hugoton-Anadarko area, *Appellee* and *Cross-Appellant,* v. PHILLIPS PETROLEUM COMPANY, *Appellant* and *Cross-Appellee.*

(567 P.2d 1292)

528

530

Opinion filed July 11, 1977.

*Joseph W. Kennedy,* of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, argued the cause, and *T. L. Cubbage, II,* of Phillips Petroleum Company, of Amarillo, Texas, was with him on the briefs for the appellant and cross-appellee.

*W. Luke Chapin,* of Chapin & Penny, of Medicine Lodge, argued the cause, and *Alan C. Goering,* of the same firm, was with him on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

SCHROEDER, J.: This is a class action suit filed against Phillips Petroleum Company seeking to recover interest on "suspense royalties" attributed to gas produced from leases in the three-state Hugoton-Anadarko area during the nine-year period from June 1961, to October 1970. Phillips Petroleum Company finally paid what it termed "suspense royalties" without interest in December 1972, after the Federal Power Commission (FPC) approved certain of Phillips' pending gas price rate increase applications. The trial court determined (1) the matter could be tried as a class action, (2) the class members had not waived any claim for

interest, (3) that Phillips was liable for interest on a theory of unjust enrichment, and (4) the class should be awarded six percent compound interest. Phillips Petroleum Company has appealed and the class has cross-appealed asserting the points hereinafter considered and determined.

Irl Shutts (plaintiff-appellee and cross-appellant), a resident of Sun City, Kansas, is the executor of the estate of Althea Shutts, and a royalty owner under producing oil and gas leases owned by Phillips Petroleum Company (defendant-appellant and cross-appellee) (hereafter Phillips) in the Hugoton-Anadarko area. Shutts or his predecessor in title, Althea Shutts, received certain of the "FPC suspense money," so-called, paid out as royalties by Phillips as hereinafter set forth. The trial court certified Shutts as a member and proper representative of a class of approximately 6,400 gas royalty owners (less a small number of such royalty owners who have opted-out after having received notice given by publication and mailing according to order of the court) who received retained funds paid out as royalties by Phillips as a result of Federal Power Commission Opinion No. 586, issued September 18, 1970, by the Commission and which became final October 28, 1972, determining the lawful gas rates in the Hugoton-Anadarko area rate proceedings. (*In re Hugoton-Anadarko Area Rate Case,* 466 F.2d 974 [9th Cir. 1972].)

During her lifetime, Althea Shutts, a resident of Kansas, owned one-seventh (1/7) of the lessor's interest in two oil and gas leases covering lands in Oklahoma and Texas. These leases were within the Federal Power Commission's rate-making area known as the "Hugoton-Anadarko area" which encompasses all of the State of Kansas and the panhandle sections of Texas and Oklahoma. (See 18 C.F.R. § 154.106[g].) The lessee's interest in Althea Shutts' two leases was owned by Phillips Petroleum Company which operated five producing gas wells.

On each of these two leases, Althea Shutts' predecessor in title had entered into a *gas royalty agreement* with Phillips which has remained in full force and effect and which provides that the royalty paid to the lessor shall be computed in relation to the weighted average price per Mcf *received* by Phillips during any calendar month from all sales of gas delivered by Phillips within a certain "designated area."

On June 7, 1954, in *Phillips Petroleum Co. v. Wisconsin,* 347

U.S. 672, 98 L.Ed. 1035, 74 S.Ct. 794, it was determined that Phillips, as an independent natural gas producer selling gas to interstate pipeline companies for interstate transportation and resale, was a "natural gas company" within the Natural Gas Act. (15 U.S.C. § 717, *et seq.*) Accordingly, such sales of gas by Phillips were subject to regulation by the Federal Power Commission (hereafter FPC). By various orders issued since that decision, the FPC *has suspended increases in prices for sales* of gas by Phillips *and has permitted such increases to be collected* at some date subsequent to the original date proposed by Phillips, only upon Phillips' filing with the Commission *a corporate undertaking to refund any or all portions of such increase* which the FPC might find not to have been justified. This corporate undertaking cost Phillips nothing to obtain. *Phillips chose to collect the higher rate,* subject to possible refund, because increases in gas sales prices not made effective subject to FPC approval could not be made retroactive. *Phillips filed the required corporate undertaking to refund the "FPC suspense money."*

After June 7, 1954, Phillips sold gas in the "designated area" and throughout the Hugoton-Anadarko area. Some of this gas was sold subject to the FPC jurisdiction at prices which had not been approved by the FPC. *The increased prices for some,* but not all, of Phillips' gas sales in the "designated area" and the Hugoton-Anadarko area *were collected by Phillips subject to a duty to refund the same to the gas purchasers* in the event the FPC failed to approve the sales prices pursuant to Section 4(e) of the Natural Gas Act, 15 U.S.C. § 717c(e), *with interest at seven percent (7%) per annum from the date of receipt until September 18, 1970, and eight percent (8%) per annum thereafter until paid out, if the FPC did not approve the sales price.* (18 C.F.R. § 154.102[c] and FPC Opinion No. 586, p. 33.) Until such time as the FPC approved such increased sales prices, or a portion of such prices, Phillips was entitled to retain the proceeds from such sales under federal cases holding that the royalty owners had no legally enforceable right to obtain such monies held by Phillips subject to refund. (See *Ashland Oil & Refining Company v. Staats, Inc.,* 271 F. Supp. 571, 579 [D. Kan. 1967]; and *Boutte v. Chevron Oil Company,* 316 F. Supp. 524 [E.D. La. 1970], aff'd 442 F.2d 1337 [5th Cir. 1971].)

Until June 1, 1961, Phillips in its monthly payments to its gas

royalty owners in the Hugoton-Anadarko area paid all of their share of the increased rates being collected by Phillips subject to refund, as well as their share of proceeds from the sale of gas which were not subject to refund, the so-called "firm" proceeds. *Beginning June 1, 1961, Phillips' management decided to begin withholding all of its royalty owners' share of increased gas prices subject to refund, unless the royalty owners put up an acceptable indemnity to repay the same with interest if the increased prices were not approved by the FPC.*

In July 1961, Phillips gave the following notice to Althea Shutts and all other royalty owners in the Hugoton-Anadarko area:

"NOTICE

"As you probably know, since June, 1954, all sales of gas to the interstate pipelines have been subject to the control of the Federal Power Commission. Phillips has been successful since that time in securing a number of increases in its contract prices, but these could not be placed into effect until they were approved, after investigation and hearing, by the Federal Power Commission, *except by the agreement of Phillips to refund to the purchaser, with appropriate interest, such amounts that are not finally allowed by the Commission.* Heretofore, Phillips Petroleum Company has voluntarily computed royalties paid you *on the basis of a weighted average price* which included total proceeds received in the area, without regard to the possibility of future refunds. This practice can no longer be continued. Effective June 1, 1961, and until further notice, royalties paid you will be computed by excluding that portion of any price being collected subject to refund which exceeds 11 [cents] per Mcf (presently the maximum area price level for increased rates as recently announced by the Federal Power Commission in its Statement of General Policy). Payment of royalty based on the balance of the sums collected will be made at such time as it is determined that the sums collected are no longer subject to refund.

"Interest owners desiring to receive payments computed currently on the full sums being collected may arrange to do so by furnishing Phillips Petroleum Company acceptable indemnity to cover their proportionate part of any required refunds, plus the required interest.

"PHILLIPS PETROLEUM COMPANY<br>NATURAL GAS DEPARTMENT<br>BARTLESVILLE, OKLAHOMA"

(Emphasis added.)

The indemnity which Phillips required was not a no-cost corporate undertaking, which was all Phillips filed with the FPC. Rather, Phillips required a corporate surety bond in an amount based on estimated production for two years, *plus seven percent (7%) interest,* subject to Phillips' review at the end of eighteen (18) months.

This notice was included with Phillips' royalty checks for June 1961, that were mailed to all its royalty owners on July 28, 1961. Seventeen (17) persons or entities (who are not members of this class action) did furnish indemnities acceptable to Phillips and received current payments computed on the full sums being collected, including amounts subject to refund. However, none of the approximately 6,400 class members responded to Phillips' offer contained in the notice, or requested that they be allowed to furnish Phillips with acceptable indemnity, so that they might be paid otherwise than according to the method outlined in Phillips' July 28, 1961, notice.

At various times after May 20, 1960, Phillips had nineteen (19) applications before the FPC requesting permission to increase the price for sales of gas by it within the "designated area." In due course the FPC issued orders suspending the nineteen (19) rate increase applications. On November 27, 1963, the FPC consolidated the applications of Phillips and others for hearing in the Hugoton-Anadarko area rate proceeding.

From June 1, 1961, to October 1, 1970, Phillips deposited the increased rate monies collected *in its general account and commingled it with its other funds,* without ever giving notice of this fact to royalty owners during the time it was holding money. It is important to note that during this period of time *Phillips had no entitlement to the gas royalty owners' share of the "suspense royalties," whether or not the rates were approved by the FPC.* Phillips never owned this money. While Phillips collected eight-eighths (8/8) of the increased rates, under no condition was the one-eighth (⅛) of the increase attributable to the royalty owners ever to go to Phillips. That royalty share, according to eventual FPC ruling, was either to go to Phillips' royalty owners, or back to Phillips' gas purchasers with interest, or part to one and part to the other.

On September 18, 1970, the FPC issued Opinion No. 586 in the Hugoton-Anadarko rate cases which established sales prices applicable to the gas sales and refund requirements. The order was made effective October 1, 1970. (See 44 FPC 761 and 35 Fed. Reg. 15,986 [1970].) The effect of FPC Opinion No. 586 was to approve the increased rates collected by Phillips from September 1, 1956, to the extent of approximately $152,000,000 in plant sales of gas and approximately $1,000,000 in field or lease sales of gas,

and to disapprove rate increases to the extent of approximately $29,000,000 in plant sales of gas and $73,000 in lease sales of gas, the latter amounts being found refundable to the gas purchasers with interest.

However, the FPC had no jurisdiction over landowner royalty interests relating to the sale of gas, and it undertook to make no ruling with reference to whether any interest or compensation was payable by the producers to the royalty owners for "suspense royalties" held by Phillips.

As of October 1, 1970, Phillips again began paying all of the royalty owners, to whom it accounted, royalties including the rate increases as to current monthly royalties, but Phillips did not then pay any back "suspense royalties" on monies previously withheld. On or about November 25, 1970, Phillips sent the following notice to Althea Shutts and other royalty owners in the class:

"NOTICE CONCERNING FEDERAL POWER COMMISSION OPINION NO. 586 COVERING INTERSTATE SALES OF GAS PRODUCED FROM THE HUGOTON-ANADARKO AREA:

"Effective as of October 1, 1970, and until further notice, Phillips Petroleum Company is giving effect to the full ceiling rate levels established by the Federal Power Commission in Opinion No. 586. If the check enclosed herewith includes payment for your interest in properties in the Hugoton-Anadarko Area, you are hereby notified that such payment has been based upon the full ceiling rate levels established by the Opinion.

"If such Opinion should be changed, set aside, or vacated, resulting in a reduction of the rate levels relied upon by Phillips in its calculations, Phillips will expect you to reimburse it in full for any overpayments occasioned thereby. Such recovery may be had, at Phillips' election, by withholding from subsequent payments to you for your interest in oil or gas, or both oil and gas, whether or not produced from the same properties under which the overpayment occurred.

"Your acceptance of the enclosed check will be regarded as evidence of your consent to such recovery.

"PHILLIPS PETROLEUM COMPANY
EXPLORATION & PRODUCTION DEPARTMENT
GAS SETTLEMENTS DIVISION - 619 FPB
BARTLESVILLE, OKLAHOMA 74004"

The foregoing notice from Phillips to Althea Shutts and all class members was included with Phillips' royalty checks for October 1970.

Litigation regarding FPC Opinion No. 586 continued until July 31, 1972, when the Ninth Circuit Court of Appeals affirmed the FPC opinion. When no appeal was taken, the opinion became

final on October 28, 1972. (See *In re Hugoton-Anadarko Area Rate Case,* supra.)

On or about December 7, 1972, Phillips mailed royalty checks to royalty owners in payment of the increased royalties due them by virtue of the finality of FPC Opinion No. 586. Phillips paid Althea Shutts the sum of $2,831.25, and paid out approximately $5,700,000 in additional royalties to over 6,400 persons, firms, corporations and entities (which includes the class as defined by the trial court). Only 218 of these persons were residents of Kansas. Of that number only 128 had executed gas royalty agreements of the type under which Althea Shutts' royalty was paid. (See Phillips' July 1961, notice to *all* of its royalty owners in the Hugoton-Anadarko area heretofore quoted as stipulated by the parties herein.) The record is barren as to the number in the plaintiff class residing in other states who have gas leases with Phillips covering land in Kansas, which encompasses the largest portion of the Hugoton-Anadarko area.

At the time of these payouts, Phillips sent the following notice to each payee:

"NOTICE

"The enclosed check covers payment based upon gas proceeds which have heretofore been held in suspense pending determination by the Federal Power Commission of the just and reasonable rates applicable to the Hugoton-Anadarko Area, and, subsequent to issue of Opinion No. 586 of the Federal Power Commission which determined such rates, pending appeal and judicial finality of said Opinion. The decision of the Circuit Court of Appeals affirming Opinion No. 586 has recently become final.

*"Credits to leases for these heretofore suspended sums have been acrrued by computer in suspense accounts, pursuant to numerous Federal Power Commission dockets.* The detailed monthly prices and lease accrual information cannot, therefore, be reflected in any practicable manner on the enclosed check. *The detail of our computations can be audited during regular business hours at our Bartlesville, Oklahoma office.*

"PHILLIPS PETROLEUM COMPANY
SETTLEMENTS DIVISION
EXPLORATION & PRODUCTION DEPARTMENT
BARTLESVILLE, OKLAHOMA 74004"

(Emphasis added.)

The foregoing notice discloses Phillips neither paid nor offered to pay any interest for the use of the money, nor did Phillips say anything about interest or how long the money had been held or used by Phillips.

Althea Shutts accepted the payment for increased royalties

before she died on May 15, 1974. On September 16, 1974, Irl Shutts filed this action. Shutts, as a representative of approximately 6,400 royalty owners, claimed approximately $1,000 interest for himself and interest for the members of the class on the amount ultimately paid to the royalty owners which have heretofore been denominated "suspense royalties."

On November 26, 1974, Shutts filed a motion to certify the action as a class action. On May 1, 1975, Judge Robert M. Baker granted Shutts' motion for a class order under K.S.A. 60-223 and ordered notice to be given to all gas royalty owners in the Hugoton-Anadarko area, regardless of whether such leases covered land in Kansas, Texas or Oklahoma. Phillips' request to take an interlocutory appeal was denied.

Shutts prepared notices which were distributed by Phillips during a monthly royalty payment mailing to all royalty owners in the Hugoton-Anadarko area then receiving royalties from Phillips. After setting forth the facts surrounding the lawsuit, the notice provided:

"1.  The court will include as members of the plaintiff class herein all of the gas royalty owners addressed above; provided, however, any person or concern so included may by filing a written request to the Clerk of the District Court of Kiowa County, Kansas, Greensburg, Kansas, 67054, on or before the 30th day of April, 1976 [original notice specified July 15, 1975] be excluded from the class unless upon notice and after hearing and for stated reasons the court finds that inclusion is essential to the fair and efficient adjudication of the controversy. Any class member, if he so desires, may appear in the case in person or through his own counsel; otherwise, plaintiff's counsel will represent him as a member of plaintiff class.

"2.  Judgment in this action, whether for the plaintiff class or for the defendant, will be binding on all class members except those who may be excluded as above stated. Class members excluded will not be entitled to share in the benefit of any judgment or settlement entered or concluded favorable to plaintiff class.

"3.  Plaintiffs' attorneys' fees are contingent on recovery. If the plaintiffs are successful, the court will allow a reasonable attorneys' fee for plaintiffs' attorneys out of the interest fund created. If plaintiffs are unsuccessful, there will be no allowance of attorneys' fees."

Notices were also published in seven area newspapers and sent by first class mail by the plaintiff to former royalty owners. Judge Baker later disqualified himself, and Judge Duckworth was eventually assigned to this case.

On August 12, 1975, three Texas residents mailed a notice to the clerk of the district court saying they did not wish to par-

ticipate in this class action suit. Because this notice was not timely filed and because a multiplicity of suits could occur if exclusion was granted, the trial court sustained *Phillips' motion* to deny the exclusion.

The trial court adopted by reference the stipulations of the parties set forth in the pretrial order as its findings of fact and concluded (1) the matter could be tried as a class action, (2) the class members had not waived any claim for interest, (3) that Phillips was liable for interest on a theory of unjust enrichment, and (4) the class should be awarded six percent compound interest. Specifically, the trial court determined in its conclusions of law:

"1.   This is a proper class action under the provisions of K.S.A. Supp. 60-223 because:

(a) The approximately 6400 royalty owners in the Hugoton-Anadarko area makes joinder impractable [sic];

(b) Any interest due each member of the class is too small to justify separate actions;

(c) Questions of fact and law are common to all members in that *the facts are really undisputed and the sole legal issue presented is whether the plaintiff members are entitled to interest on the suspended royalties held by defendant;*

(d) The claims of the named parties herein are typical of the claims of all members of the class and will fairly and adequately protect the interest of the class;

(e) The question presented common to all members of the class predominates over any individual question and a class action is not only superior but the only efficient manner to adjudicate the dispute herein (to avoid multiple suits and excessive expenses) *and that this court having jurisdiction of a large physical portion of the Hugoton-Anadarko area is a convenient forum for such action.*

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"4.   The defendant concomitant with its duty to its royalty owners to secure the best price obtainable (under its covenant to market) had the duty to remit the collected share of royalty as promptly as commercially feasable [sic] on the same conditions as it was received by defendant or in the alternative to place the funds in a proper investment fund for subsequent disbursement. The fact that FPC permitted and essentially required defendant to post bond and agree to pay back interest if a refund was ordered did not entitle defendant to free use of the royalty owners share of the increased proceeds. The FPC bond and interest pay back requirements certainly justify and permit defendant business use of the increased rates of its own share of those rates but not the royalty owners share which did not belong to defendant under any eventual ruling by the FPC. See *Phillips Petroleum Co. v. Adams,* 513 F2d 355. The Court therefore concludes that the defendant is liable for interest on royalty proceeds retained by it and used as a

business asset by it pending final FPC approval and conclusion of litigation based on its contractual duty to remit royalty proceeds in a reasonably prompt manner. It is specifically not the basis of this decision that such duty arises from an attempt to impose any facet of fiduciary relationship to the defendant.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"7.    The acceptance without an accounting as to rates or interest of payment of the suspended royalties herein in December, 1972, did not constitute ratification because there was no basis for the royalty owners to know what was involved in the payment. For the same reason estoppel does not apply to preclude recovery herein.

"8.    Division orders and unitization orders cannot be construed to modify the lease obligations of the defendant, being instruments reflecting royalty owners interests in proceeds from production and unitization of acreage for allowables respectively. No consideration is reflected in these instruments which would support defendant's contention that these instruments, executed subsequent to the original leases herein, were contracts to modify the royalty provisions of said leases. For the same reasons, the gas royalty agreements do not change defendant's obligations under their original leases except for agreements to the controlled price.

"9.    Defendant's contention that the payment of the additional royalties in December 1972 constituted a 'bounty' to plaintiffs is without any foundation and is contrary to said 'gas royalty agreements' establishing the FPC approved prices as the basis for royalty payments.

"10.    To allow defendant free use of the royalty share of production for over ten years as a result of the difficulties and delays caused by the FPC regulations would unjustly enrich defendants. Defendant paid the full royalty share of proceeds collected prior to June 1, 1961, and after October 1, 1970. The decision to withhold the increased (but unapproved) rates in the intervening period was a unilateral decision by defendant that cannot rise to the stature of a defense of ratification. Nor does it support the 'bounty' theory of defendant herein as noted above.

"11.    The statutory rate of interest herein in Kansas, Oklahoma and Texas is six per cent per annum and is allowed as the proper rate of interest to be applied to the suspended royalties herein from time of receipt until date of judgment herein with interest compounded on an annual basis." (Emphasis added.)

Appeal has been duly perfected by Phillips, and a cross-appeal has been taken challenging the amount of interest awarded by the trial court.

The appellant *contends* the trial court erred in holding that it had jurisdiction over *in personam* claims of unnamed nonresident class plaintiffs having no contact with the State of Kansas.

Here the representative of the *plaintiff class* is a resident of Kansas. The named defendant does business in Kansas, and has been duly served with process in Kansas. No question is asserted on this appeal as to the jurisdiction of the trial court over the defendant or the trial court's power to enforce a judgment against

the defendant. Two hundred and eighteen *plaintiff class members* are Kansas residents, and an unknown number of the plaintiff members, many of whom reside in other states, have gas leases with Phillips covering Kansas lands. But it must be conceded some gas leases or other contracts entered into between Phillips and the gas royalty owners in the plaintiff class involve persons who are not residents of Kansas or persons who have gas leases covering land which is outside the physical boundaries of Kansas or both.

It is a basic rule of law that for a person to be bound by a state court's judgment affecting his legal rights, he must be subject to the adjudicating court's jurisdiction. The question presented is how can a Kansas court assert jurisdiction in a *plaintiff class action*, where some of the individual plaintiff class members do not reside in Kansas and do not have land in Kansas covered by leases with Phillips.

It is apparent the multistate class action filed herein presents a novel issue in terms of *in personam* jurisdiction. However, while multistate class actions are novel, state courts have long been confronted with actions brought against nonresident defendants. Out of these cases have developed jurisdictional principles which permit courts to assert personal jurisdiction over a foreign defendant or to obtain jurisdiction over the property of a foreign defendant, and in both cases to render a binding judgment.

The basic requirements to subject *defendants* to personal liability were first established in *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565, where the United States Supreme Court held:

". . . The authority of every tribunal is necessarily restricted by the territorial limits of the State in which it is established. Any attempt to exercise authority beyond those limits would be deemed in every other forum, as has been said by this court, an illegitimate assumption of power, and be resisted as mere abuse. . . ." (p. 720.)

The ruling in *Pennoyer* was expanded and made more flexible by cases examining the "minimum contacts" necessary to exercise *in personam* jurisdiction over a nonresident defendant. (*Internat. Shoe Co. v. Washington,* 326 U.S. 310, 90 L.Ed. 95, 66 S.Ct. 154, 161 A.L.R. 1057; and *McGee v. International Life Ins. Co.,* 355 U.S. 220, 2 L.Ed.2d 223, 78 S.Ct. 199.) *Pennoyer* was also expanded by *quasi in rem* judgments binding a nonresident defendant by the court's exercise of *in rem* jurisdiction over the

nonresident defendant's property, thereby subjecting the property to the court's jurisdiction. (Note, Consumer Class Actions with a Multistate Class: A Problem of Jurisdiction, 25 Hastings L. J. 1411, 1426-1428 [1974].)

Recently, in *Hanson v. Denckla,* 357 U.S. 235, 2 L.Ed.2d 1283, 78 S.Ct. 1228, the United States Supreme Court reaffirmed the *Pennoyer* rule in holding that the lower court's exercise of *in personam* jurisdiction over the nonresident defendant was invalid. The United States Supreme Court stated:

".  .  . But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. (Citation omitted.) Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a *defendant* may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him.  .  .  ." (p. 251.) (Emphasis added.)

The most recent case of the United States Supreme Court indicating the parameters of *quasi in rem* jurisdiction over nonresident defendants is *Shaffer v. Heitner,* ____ U.S. ____, 53 L.Ed.2d 683, 97 S.Ct. ____ [No. 75-1812, decided June 24, 1977], following *Internat. Shoe Co. v. Washington,* supra.

Kansas cases examining and following these jurisdictional requirements over *nonresident defendants* include *Misco-United Supply, Inc. v. Richards of Rockford, Inc.,* 215 Kan. 849, 528 P.2d 1248; *Tilley v. Keller Truck & Implement Corp.,* 200 Kan. 641, 438 P.2d 128; and *Woodring v. Hall,* 200 Kan. 597, 438 P.2d 135.

These cases all deal with nonresident defendants, not nonresident plaintiffs. Whether all *nonresident plaintiffs* in a class action are required to have "minimum contacts" with the forum is a different matter. Because a class action must necessarily proceed in the absence of almost every class member, we hold the residential makeup of the class membership is not controlling. (Note, Consumer Class Actions with a Multistate Class: A Problem of Jurisdiction, *supra* at 1432.) What is important is that the nonresident plaintiffs *be given notice and an opportunity to be heard and that their rights be justly protected by adequate representation.* These are the essential requirements of due process, and they must be satisfied in any class action by every court, state or federal, regardless of the residences of the absent class members. Therefore, while the essential element necessary to establish

jurisdiction over nonresident defendants is some "minimum contacts" between the defendant and the forum state, *the element necessary to the exercise of jurisdiction over nonresident plaintiff class members is procedural due process.*

That there is indeed a difference between the *jurisdictional standards* governing class actions, and those governing all other actions, was emphasized long ago by the United States Supreme Court in *Hansberry v. Lee,* 311 U.S. 32, 85 L.Ed. 22, 61 S.Ct. 115, 132 A.L.R. 741. There the court refused to bind a Negro petitioner to a judgment against him, as a member of a class on the basis of earlier litigation, where a false and fraudulent stipulation was entered into. In that case the court noted:

"It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process. *Pennoyer v. Neff,* 95 U.S. 714; 1 Freeman on Judgments (5th ed.), § 407. A judgment rendered in such circumstances is not entitled to the full faith and credit which the Constitution and statute of the United States, R.S. § 905, 28 U.S.C. § 687, prescribe. . . .

"To these general rules there is a recognized exception that, to an extent not precisely defined by judicial opinion, the judgment in a 'class' or 'representative' suit, to which some members of the class are parties, may bind members of the class or those represented who were not made parties to it. . . .

". . . Courts are not infrequently called upon to proceed with causes in which the number of those interested in the litigation is so great as to make difficult or impossible the joinder of all *because some are not within the jurisdiction* or because their whereabouts is unknown or where if all were made parties to the suit its continued abatement by the death of some would prevent or unduly delay a decree. In such cases where the interests of those not joined are of the same class as the interests of those who are, and where it is considered that the latter fairly represent the former in the prosecution of the litigation of the issues in which all have a common interest, the court will proceed to a decree. . . ." (pp. 40-42.) (Emphasis added.)

Thus, although the general rule is that only persons subject to a court's jurisdiction are bound by its judgment, there is a recognized exception for suits of a representative character. While the United States Supreme Court conceded that the extent of this exception had not been precisely defined by judicial opinion, it went on to suggest that if a class were adequately represented, its interest would be protected and the court could proceed to a final decree. These pronouncements, although pure dicta, would not have been included in the opinion unless they were intended to state the rule regarding class actions. The opinion also foretells

what is an essential requisite of due process as to absent plaintiff class members, adequate representation. (See *Gray v. Amoco Production Co.*, 1 Kan. App. 2d 338, 564 P. 2d 579.)

An examination of the nature of class action suits provides a historical background for this conclusion. Class action suits arose in equity and were known to English chancery practice since the Seventeenth Century. (A. Homburger, State Class Actions and the Federal Rule, 71 Colum. L. Rev. 609, 611 [1971]; and H. Hunter, Georgia Investment Company v. Norman—The Supreme Court Creates a New Form of Class Action for Georgia, 24 Mercer L. Rev. 447, 448 [1973].)

In the 1853 opinion of *Smith et al v. Swormstedt, et al,* 57 U.S. (16 How.) 288, 14 L.Ed. 942, the United States Supreme Court gave its blessing to the equitable class suit by noting:

"The rule is well established, that where the parties interested are numerous, and the suit is for an object common to them all, some of the body may maintain a bill on behalf of themselves and of the others; and a bill may also be maintained against a portion of a numerous body of defendants, representing a common interest. . . ." (* p. 302.)

In 1938, the Federal Rules of Civil Procedure defined class actions in terms of the abstract nature of the rights involved: the so-called "true" category was defined as involving "joint, common, or secondary rights"; the "hybrid" category, as involving "several" rights related to "specific property"; the "spurious" category, as involving "several" rights affected by a common question and related to common relief. (See Proposed Rules of Civil Procedure, 39 F.R.D. 69, 98 [1966].)

Because of the unworkability of these classifications, the Federal Rules of Civil Procedure were amended in 1966. It was decided the new rules would allow a judgment to bind all class members unless a member affirmatively "opted out" of the litigation at its commencement. (Fed. R. Civ. P. 23 [c] [3].)

Recently the United States Supreme Court has required plaintiffs to assume the cost of notice in common-question class actions. (*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 40 L.Ed.2d 732, 94 S.Ct. 2140.) The United States Supreme Court has also refused to aggregate class action claims to meet the $10,000 federal jurisdictional requirements. (*Zahn v. International Paper Co.,* 414 U.S. 291, 38 L.Ed.2d 511, 94 S.Ct. 505; and *Snyder v.*

*Harris,* 394 U.S. 332, 22 L.Ed.2d 319, 89 S.Ct. 1053, reh. denied 394 U.S. 1025, 23 L.Ed.2d 50, 89 S.Ct. 1622.) While the results are supported by the fear of overloading the federal judicial system and the desire not to judicially expand the constitutionally established jurisdictional limits, these recent United States Supreme Court cases have clearly restricted access to federal courts. This suit, for example, could not be brought in a federal court. Furthermore, the FPC does not have jurisdiction over the matter. If the state courts will not hear the matter, who will grant relief?

If state courts cannot maintain class action suits with nonresident plaintiffs, can the "small man" find legal redress in our modern society which increasingly exposes people to group injuries for which they are individually unable to get adequate legal redress, either because they do not know enough or because such redress is disproportionately expensive? (See A. Homburger, State Class Actions and the Federal Rule, 71 Colum. L. Rev. 609, 641-643 [1971].)

The appellant argues this action should be brought in several different state courts. This risks inconsistent adjudications for a class which is otherwise treated alike. Furthermore, the statute of limitations has run in Oklahoma and Texas. The United States Supreme Court has held the commencement of a class action suit tolls the applicable statute of limitations as to all members of the class. (*American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 38 L.Ed.2d 713, 94 S.Ct. 756, reh. denied 415 U.S. 952, 39 L.Ed.2d 568, 94 S.Ct. 1477; and *Eisen v. Carlisle & Jacquelin,* supra.) However, if in this action Kansas is without jurisdiction over class plaintiffs in other states, this action would not toll the statute of limitations in those states.

We examine then the Kansas rules regarding class actions. Our statutes reveal a recognition of the need for permitting actions to be brought by a named plaintiff in a representative capacity. (G.S. 1868, ch. 80, § 38; L. 1909, ch. 182, § 37; R.S. 1923, 60-413; and L. 1963, ch. 303, § 60-223, amended by Supreme Court order dated July 17, 1969.)

In its present form the Kansas Class Action Rule, modeled after the Federal Rule of Civil Procedure 23, is found at K.S.A. 60-223. It gives the prerequisites for a class action as follows:

"(a) *Prerequisites to a class action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so

numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"(b)   *Class actions maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (*a*) are satisfied, and in addition:

"(1)   The prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

"(2)   the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

"(3)   the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) The interest of members of the class in prosecuting or defending separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against members of the class; (C) the appropriate place for maintaining, and the procedural measures which may be needed in conducting, a class action."

Phillips argues this is not a proper case for class action treatment under K.S.A. 60-223(*b*)(3) because there are differing questions of law and fact governing the rights which arise under gas leases in three states. Phillips attempts to apply an overly restrictive interpretation of the "commonality" requirement of K.S.A. 60-223(*a*). (*Gray v. Amoco Production Co.,* supra; *Sommers v. Abraham Lincoln Federal Savings & L. Ass'n,* 66 F.R.D. 581 [E.D. Pa. 1975]; and *Fertig v. Blue Cross of Iowa,* 68 F.R.D. 53 [N.D. Iowa 1974].) However, as explained later in this opinion, there are questions of fact and law common to the plaintiff class. (See *Perlman v. First National Bank of Chicago,* 15 Ill. App. 3d 784, 305 N.E.2d 236 [1973], appeal dismissed 60 Ill. 2d 529, 331 N.E.2d 65.)

Citations to the venue statutes of Kansas and other states are inapplicable here. (See *United States v. Trucking Employers, Inc.,* 72 F.R.D. 98 [D.D.C. 1976].) First, venue is not a jurisdictional matter, but a procedural one. (*Gray v. Amoco Production Co.,* supra; and 77 Am. Jur. 2d, Venue, § 1, p. 832.) Second, this is a transitory action affecting real property only incidentally. Be-

cause this court has *in personam* jurisdiction over the defendant, venue lies in Kiowa County. (*Gray v. Amoco Production Co.,* supra; 20 Am. Jur. 2d, Courts, § 121, p. 476-477; and *Farha v. Signal Companies, Inc.,* 216 Kan. 471, 532 P.2d 1330, modified 217 Kan. 43, 535 P.2d 463.) Lastly, if the venue attack is carried to its logical conclusion a class action could not even be maintained in Kansas with Kansas residents because the venue statute would require separate suits in the different counties.

After reviewing K.S.A. 60-223, we hold Kansas courts can exercise jurisdiction over nonresident plaintiffs in a class action if procedural due process guarantees are met. Although no case in Kansas or any other jurisdiction is precisely in point on the factual situation here presented, many courts in cases from other jurisdictions have reached out to bind nonresident plaintiffs.

In *Chance v. Superior Court,* 58 Cal.2d 275, 23 Cal. Rptr. 761, 373 P.2d 849 (1962), the California Supreme Court held a class action to foreclose separate trust deeds securing each of 2,139 notes was proper and did not deny due process to unnamed noteholders, many of whom may not have been California residents, where the class was ascertainable and susceptible to notice, where the virtually identical notes were created in a single transaction as part of a speculative scheme, where all policyholders had common interests in reaching other assets, and where their individual lots were all in one tract which was more valuable as an entity.

In *Daar v. Yellow Cab Co.,* 67 Cal.2d 695, 63 Cal. Rptr. 724, 433 P.2d 732 (1967), the plaintiff brought a class action on behalf of himself and all other users of the taxi cab services in the Los Angeles area who were overcharged by Yellow Cab. The California Supreme Court permitted this class action to proceed although some members of the plaintiff class were unknown and may have been residents of other states.

In *Horst v. Guy,* 211 N.W.2d 723 (N.D. 1973), the plaintiff filed a class action to secure payment of a veteran's bonus under the North Dakota Vietnam Conflict Veterans' Adjusted Compensation Act. The appellants claimed a class action was inappropriate because the district court might not have jurisdiction over all class members because some members were outside the state of North Dakota. The North Dakota Supreme Court held:

". . . [T]he fact that some of the members of the [plaintiff] class may not be

within North Dakota does not remove the jurisdiction of the district court to hear the case as a class action." (p. 727.)

However, there the class was limited to North Dakota residents or former residents who were no longer residents of the state.

Furthermore, the lower federal courts seem to be relatively untroubled by the inclusion of nonresidents in classes represented before them, although federal courts are, in the absence of statute, generally limited in territorial reach of personal jurisdiction to the state in which they sit. (Fed. R. Civ. P. 4[f]; 4 Wright and Miller Federal Practice and Procedure, § 1124 [1969]; Compare *School Dist. of Philadelphia v. Harper & Row Publishers, Inc.,* 267 F. Supp. 1001, 1005 [E.D. Pa. 1967].) While the residential characteristics of a class are seldom discussed by federal courts, it is reasonable to assume from the various factual circumstances giving rise to federal class actions that the court's jurisdiction over the entire class is not affected by the fact some members reside outside the state in which the court sits. (See *e.g., Philadelphia Electric Co. v. Anaconda American Brass Co.,* 43 F.R.D. 452 [E.D. Pa. 1968]; and *City of Philadelphia v. Morton Salt Company,* 248 F. Supp. 506 [E.D. Pa. 1965].)

Many commentators agree a state court has the power to bind a nonresident plaintiff class member. Professor Chafee in *Some Problems of Equity* (1950) notes the Restatement of Judgments "gives the court where a class action is properly brought jurisdiction to bind unnamed members, even if not personally within the jurisdiction of the court." He recognizes the usual rules of *res judicata* apply to all representative suits, but agrees that with some limitations the propositions of the Restatement should usually be applied.

Professor Moore in his treatise, 3B Moore's Federal Practice, § 23.11(5), in discussing the 1938 Federal Rule of Civil Procedure 23 indicates:

"The fact that members of the class are beyond the territorial limits of the class suit court is immaterial as to the binding effect of the class suit judgment." (p. 23-2893.)

The Restatement of the Law of Judgments verbalizes the answer to the question of nonresident plaintiff class members without equivocation:

"§ 26. REPRESENTATIVE OR CLASS ACTIONS.
"Where a class action is properly brought by or against members of a class, the

court has jurisdiction by its judgment to make a determination of issues involved in the action which will be binding as res judicata upon other members of the class, *although such members are not personally subject to the jurisdiction of the court."* (p. 118.) (Emphasis added.)

Tentative Draft No. 2 of the Restatement of the Law of Judgments, Second, § 85 (April 15, 1975) states:

"(1)   A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of the rules of res judicata as though he were a party. A person is represented by a party who is:

.   .   .   .   .   .   .   .   .   .   .   .

"(e)   The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.

"(2)   A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process." (pp. 56-57.)

We are persuaded the view expressed by the foregoing authorities represents the correct rule of law to follow. (Contra, Note, Expanding the Impact of State Court Class Action Adjudications to Provide an Effective Forum for Consumers, 18 UCLA L. Rev. 1002, 1019 [1971]; and Fisch, Notice, Costs, and the Effect of Judgment in Missouri's New Common-Question Class Action, 38 Mo. L. Rev. 173, 209 [1973].)

Phillips suggests a contrary conclusion is dictated by *Klemow v. Time Incorporated,* 466 Pa. 189, 352 A.2d 12 (1976), cert. denied, 429 U.S. 828, 50 L.Ed.2d 91, 97 S.Ct. 86. There the plaintiff filed a class action suit on behalf of both residents and nonresidents of Pennsylvania who subscribed to *Life* magazine seeking to compel continued publication of the magazine. The trial court dismissed the suit but the Pennsylvania Supreme Court, while reversing on other grounds, indicated the class could not encompass nonresident plaintiffs. The court said in a footnote:

"Because the jurisdiction of the courts of the Commonwealth is territorially limited, the class may consist only of Pennsylvania residents. The class may also include non-residents who submit themselves to the jurisdiction of the state courts. (Citations omitted.)" (352 A.2d 16.)

However, the Pennsylvania class action statute, 12 P.S.App. Rules of Civ. Proc. § 2230, reads:

"(a)   If persons constituting a class are so numerous as to make it impracticable to join all as parties, any one or more of them who will adequately represent the interest of all may sue or be sued on behalf of all, but *the judgment entered in such*

*action shall not impose personal liability upon anyone not a party thereto."* (p. 241.) (Emphasis added.)

K.S.A. 60-223(*c*)(2) provides:

"The judgment in an action maintained as a class action shall extend by its terms to the members of the class, as defined, whether or not the judgment is favorable to them."

It is readily apparent the Pennsylvania statutory language is completely at variance with the Kansas statutory language. The distinction robs *Klemow* of its persuasion in Kansas. (See Donne and Van Horn, Pennsylvania Class Actions: the Future in Light of Recent Restrictions of Federal Access?, 78 Dick. L. Rev. 460, 521-524 [1973].)

In *Feldman v. Bates Manufacturing Co.,* 143 N.J. Super. 84, 362 A.2d 1177 (1976), the court indicated that without "affiliating circumstances" between the forum state and the litigation, such as a *"common trust fund,"* the judgment in a plaintiff class action suit could not bind nonresident class members. It held class action certification was not appropriate since the judgment would not satisfy due process with respect to the nonresidents. There the Bates Manufacturing Corporation had no assets in New Jersey, was not authorized to do business in New Jersey, and the vast majority of its preferred stockholders (plaintiff class members) were nonresidents with no contacts in New Jersey, which had no special interest in adjudicating litigation. However, the court noted Delaware, Bates' domiciliary state, was fully capable of providing a uniform determination of the issues involved. The *Feldman* court also applied the doctrine of *forum non conveniens* which is inapplicable here because the trial court found "this court having jurisdiction of a large physical portion of the Hugoton-Anadarko area is a convenient forum for such action."

Our rejection of the *Klemow* and *Feldman* cases as applied to the facts here presented is aided by the United States Supreme Court approval of *quasi in rem* class actions which included nonresident class members, some of whom were later found to be bound by the class action decisions. These actions involved as the *res,* insurance funds, and their holdings were found to be determinative of issues concerning the same funds in subsequent actions. In these actions, known as the "common fund" cases, the respective courts found that the various plaintiffs were members of the classes, and therefore bound by the judgments of the prior

actions, despite the fact that the prior actions were conducted in states other than those of the plaintiffs' residences.

Thus in *Hartford Life Ins. Co. v. Ibs,* 237 U.S. 662, 59 L.Ed. 1165, 35 S.Ct. 692, Ibs, a Minnesota resident who was insured by Hartford was held bound by a prior Connecticut state court judgment rendered against Dresser, a Connecticut resident, and 30 other members of Hartford holding certificates who brought suit "in their own behalf and in behalf of all others similarly situated." Dresser's unsuccessful challenge to Hartford's right to increase the premium assessments against Hartford's 12,000 members was held binding on all policyholders, regardless of residence. The United States Supreme Court stated:

" 'Where the parties interested in the suit are numerous, their rights and liabilities are so subject to change and fluctuation by death or otherwise, that it would not be possible, without very great inconvenience, to make all of them parties, and would oftentimes prevent the prosecution of the suit to a hearing. For convenience, therefore, and to prevent a failure of justice, a court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court. The legal and equitable rights and liabilities of all being before the court by representation, and especially where the subject-matter of the suit is common to all, there can be very little danger but that the interest of all will be properly protected and maintained.' . . ." (p. 672.)

(See also *Hartford Life Ins. Co. v. Barber,* 245 U.S. 146, 62 L.Ed. 208, 38 S.Ct. 54 [Connecticut judgment binding on Missouri resident].)

In *Carpenter v. Pacific Mutual Life Insurance Co.,* 10 Cal.2d 307, 74 P.2d 761 (1937), aff'd sub nom. *Neblett v. Carpenter,* 305 U.S. 297, 83 L.Ed. 182, 59 S.Ct. 170, reh. denied, 305 U.S. 675, 83 L.Ed. 437, 59 S.Ct. 355, the California Supreme Court, and ultimately the United States Supreme Court, expanded on the binding effect of judgments in insurance cases on nonresident plaintiffs. The courts upheld the right of the California Insurance Commissioner to liquidate and rehabilitate the Pacific Mutual Life Insurance Company, which was insolvent and on the brink of bankruptcy, against the wishes of the plaintiff class of policyholders. Acknowledging the significant state interest in insurance, and relying on *Hartford Life Insurance Co. v. Ibs,* supra, the California state court judgment was held binding on North Carolina, Illinois and Wisconsin residents. (*Taylor v. Insurance Co.,* 214 N.C. 770, 200 S.E. 882 [1939]; *Larson v. Pacific Mutual*

*Life Ins. Co.,* 373 Ill. 614, 27 N.E.2d 458 [1940], cert. denied, 311 U.S. 698, 85 L.Ed. 452, 61 S.Ct. 137; and *Padway v. Pacific Mut. Life Ins. Co. of California,* 42 F. Supp. 569 [E.D. Wis. 1942].)

Taken together, these cases and subsequent actions in the context of giving full faith and credit to the prior decisions of other state courts clearly recognize a class action may be binding on nonresident plaintiffs when a "common fund" is involved and where due process requirements are met. (See also *Royal Arcanum v. Green,* 237 U.S. 531, 59 L.Ed. 1089, 35 S.Ct. 724; *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 65 L.Ed. 673, 41 S.Ct. 338; *Sovereign Camp v. Bolin,* 305 U.S. 66, 83 L.Ed. 45, 59 S.Ct. 35, 119 A.L.R. 478; and *Sam Fox Publishing Co. v. U.S.,* 366 U.S. 683, 6 L.Ed.2d 604, 81 S.Ct. 1309.)

The "common fund" cases, which seem to be universally accepted, are closely analogous to the case at bar. Here Phillips filed a corporate undertaking guaranteeing to refund any or all portions of the "FPC suspense money" with interest which it collected and held pending FPC determination of the lawful gas rates in the Hugoton-Anadarko area rate proceedings. All gas royalty owners had a common concern in the funds attributable to "suspense royalties" held by Phillips. The "suspense royalties" in question never did or could belong to Phillips. If the proposed rates had been disapproved, the money *and interest,* which Phillips *agreed* to pay by its corporate undertaking, would have gone to the pipeline companies who purchased the gas from Phillips. If the proposed rates were approved, the "suspense royalties" would go to the gas royalty owners.

Had Phillips put the "suspense royalties" into a common trust fund, separate from its operating funds, to be used solely to pay either the pipeline companies or the gas royalty owners once the FPC ultimately decided the rate increase question, this case would dovetail nicely into the "common fund" cases. Instead Phillips commingled the "suspense royalties" with its other cash and used the "suspense royalties" to fulfill all its business obligations. In this manner the "suspense royalties," which never did or could belong to Phillips, enriched Phillips at the expense of the royalty owners. To hold that Phillips' act of using the money for business purposes, and not putting it into a separate corporate account, takes this case out of the "common fund" category would reward Phillips' action at the expense of innocent gas royalty owners.

In *Perlman v. First National Bank of Chicago,* 15 Ill. App. 3d 784, 305 N.E.2d 236 (1973), a class action was brought by bank borrowers who attacked the bank's computation of interest. The defendant bank attacked the class action because there was no common fund. The bank asserted any money which the class members might claim was commingled with other assets. The Illinois court held:

".  .  . There seems no basis in law or logic for permitting a class action against an individual who has sequestered all money wrongfully acquired but denying one against an individual who has commingled it with his other assets.
.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

".  .  . The liability or wrongdoing creates the fund, and whatever is taken wrongfully constitutes the fund." (pp. 800-801.)

(See also Note, Class Actions in Illinois: A Viable Alternative to Federal Rule 23?, 8 J. Marshall J. Prac. and Proc. 113 [1974].)

Phillips kept accurate records on this matter in the memory bank of its computer and our holding will not unduly burden them.

While the authorities are conflicting on whether a class action may bind nonresident plaintiffs, where a "common fund" may fairly be established, no question should be raised as to the binding effect of a class on nonresident plaintiffs.

Class actions with nonresident plaintiffs may be brought in Kansas only if due process guarantees are met. We now examine our class action statute and the procedures followed to insure that due process was provided.

Initially the query must be whether reasonable notice was given to all class members. The notice provisions of K.S.A. 60-223(*c*) differ slightly from the federal notice provisions in Federal Procedure Rule No. 23. K.S.A. 60-223(*c*)(2) reads in part:

".  .  . To afford members of the class an opportunity to request exclusion, the court shall direct that reasonable notice be given to the class, including specific notice to each member known to be engaged in a separate suit on the same subject matter with the party opposed to the class."

K.S.A. 60-223(*d*)(2) reads in part:

"In the conduct of actions to which this section applies, the court may, without limitation, make appropriate orders:.  .  . (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity

of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action. . . ."

Federal courts have attached particular significance to Rule No. 23's requirement of notice in common question actions due to the finality afforded them. Notice to those whose legal relations are to be affected by a pending action has always been a fundamental requirement of due process. As the United States Supreme Court suggested in *Mullane v. Central Hanover Tr. Co.,* 339 U.S. 306, 94 L.Ed. 865, 70 S.Ct. 652, this elementary notion applies even when the interested parties are so numerous that the task of notification is a complex one. In fact, it is *Mullane's* constitutional standard for notice that is incorporated into Rule No. 23: "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," although some suggest Rule No. 23's requirement of notice does not involve constitutional due process. (See *Eisen v. Carlisle & Jacquelin,* supra.) We need not enter into a discussion on this matter because of the notice given in this case.

Here the notice given fully comports with Federal Rule No. 23, K.S.A. 60-223 and any possible constitutional requirements. Phillips has maintained extensive records in connection with the "suspense royalties." *All gas royalty owners and their interests are known.* There are no unnamed or unknown plaintiff class members. The representative plaintiff prepared the notices, quoted earlier, which were distributed *by Phillips during a monthly payment mailing to all royalty owners in the Hugoton-Anadarko area then receiving gas royalties.* Notices were also sent by first class mail by the plaintiff to former gas royalty owners. Notices were also published in seven area newspapers.

Having Phillips mail the notice during its monthly mailing does not present error here cognizable. This procedure may not comply with the dictates of *Eisen v. Carlisle & Jacquelin,* supra, although that case does note an exception where a fiduciary duty preexisted between the plaintiff and the defendant, as in a shareholder derivative suit.

' The record discloses no objection by Phillips at the trial because it was required to mail the notice. It is well settled an issue presented for the first time on appeal will not be considered by this court. (*In re Estate of Barnes,* 218 Kan. 275, 543 P.2d 1004;

and *Landrum v. Taylor,* 217 Kan. 113, 535 P.2d 406.) In view of our favorable decision to the class, which may recover the cost of notification, this renders moot Phillips' appellate objection to mailing notice. (See *Lamb v. United Security Life Company,* 59 F.R.D. 25 [S.D. Iowa 1972]; and *Ostapowicz v. Johnson Bronze Company,* 54 F.R.D. 465 [W.D. Pa. 1972].)

Phillips argues our notice statute which allows a party to "opt-out" of a class action suit cannot be used to "bootstrap" jurisdiction of the court. Suffice it to say the federal rules and our rule regarding class actions are the result of a conscious choice to decide between provisions allowing parties to "opt-out" or "opt-in." A determination was made to follow the "opt-out" procedure to bind the greatest number of people. (See Proposed Rules of Civil Procedure, 39 F.R.D. 69, 105 [1966]; Cohn, The New Federal Rules of Civil Procedure, 54 Geo. L.J. 1204, 1226 [1966]; and Staff Studies Prepared for the National Institute for Consumer Justice on Consumer Class Action, pp. 138, 149 [1972].)

Phillips argues our class action statute does not give the putative class member an absolute right to "opt-out" as does Federal Rule No. 23(c)(2)(A). K.S.A. 60-223(*c*)(2) provides in pertinent part:

". . . [T]he court shall exclude those members who, *by a date to be specified,* request exclusion, unless the court finds that their inclusion is essential to the fair and efficient adjudication of the controversy and states its reasons therefor. . . ." (Emphasis added.)

Phillips argues by removing the choice of the putative class member to "opt-out" of the class, it was the intent of the rule to apply to persons over whom the court already had jurisdiction. We do not think such a convoluted conclusion logically follows. The language simply gives the court the power to deny exclusion to class members, be they residents or nonresidents of Kansas, whose inclusion is essential to the fair and efficient adjudication of the controversy. However, we need not examine this section in great detail. (See Staff Studies Prepared for the National Institute for Consumer Justice on Consumer Class Action, *supra* at 145-146.)

Here three Texas residents filed an *untimely* request for exclusion. *Phillips* filed a motion to deny the request for exclusion alleging in part the three men would file a class action suit in Texas. The trial court sustained Phillips' motion. However, an

*untimely* request for exclusion could be denied under either the federal or Kansas class action statutes without raising constitutional issues.

We hold reasonable notice was given to satisfy jurisdictional and constitutional due process requirements. (*Mullane v. Central Hanover Tr. Co.,* supra.)

Second, we must examine the representation accorded the resident and nonresident plaintiffs by the named representative.

K.S.A. 60-223(*d*) gives the trial court the authority to make appropriate orders as follows:

". . . (1) Settling the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, or to include such allegations, and that the action in either case proceed accordingly. The orders may be combined with an order under K.S.A. 60-216, and may be altered or amended as may be desirable from time to time."

Furthermore, K.S.A. 60-223(*e*) insures adequate representation by controlling dismissals or compromises.

Where inadequate representation is established, courts have denied *res judicata* effect to class action judgments. (See *Research Corp. v. Pfister Associated Growers, Inc.,* 301 F. Supp. 497 [N.D. Ill. 1969]; and *Gonzales v. Cassidy,* 474 F.2d 67 [5th Cir. 1973].)

The class action is premised on the theory that members of the class who are not before the court can justly be bound because the self-interest of their representative coincides with the interest of the members of the class and will assure adequate litigation of the common issues. Where the interests of absent class members have not been adequately represented, binding them by the class judgment would seem to offend the requirements of due process. (*Hansberry v. Lee,* supra.) Notice to absent members of the class in this regard is particularly important, for it is the greatest single safeguard against inadequate representation. (*Mullane v. Central Hanover Tr. Co.,* supra at 314.)

Here we find adequate representation has been accorded the plaintiff class members by their representative through his attor-

neys who have done a superior job in bringing this action and in arguing and briefing the law on this appeal.

We hasten to add, this opinion should not be read as an invitation to file nationwide class action suits in Kansas and overburden our court system. Concepts of manageability in terms of our Kansas class action statute, the nature of the controversy and the relief sought, the interest of Kansas in having the matter determined, and the class size and complexity will have to be applied. (See Note, Consumer Class Actions with a Multistate Class: A Problem of Jurisdiction, *supra* at 1438-1439.) A court should also give careful consideration, as we have attempted to do, to any possible conflict of law problems. When liability is to be determined according to varying and inconsistent state laws, the common question of law or fact prerequisite of K.S.A. 60-223($a$)(2) will not be fulfilled.

An excellent example of *a factual situation* in which a trial judge applying our class action statute should deny certification of a class action, where nonresident plaintiff class members are involved, is presented in *Feldman v. Bates Manufacturing Co.,* supra.

The manageability of the class action herein is demonstrated in various ways. There are no basic issues of fact, the material facts having been stipulated by the parties and made a part of the pretrial order. The names, addresses and suspense royalty amounts for each of the royalty owners were readily available in Phillips' records. In fact, the class is more manageable with nonresidents of Kansas included because Phillips would be required to take an extra step in separating nonresident royalty owners in its records. *Phillips treated all royalty owners in the Hugoton-Anadarko area alike, regardless of residency, particular lease provisions or royalty agreements.* (See Phillips' notices to royalty owners heretofore quoted as stipulated by the parties herein.) Actually, it would be difficult to imagine a more manageable plaintiff class action.

Kansas has a legitimate interest in adjudicating the common issue herein because Kansas comprises the largest physical area included in the FPC designated Hugoton-Anadarko area where Phillips is doing business and producing gas which it sells in interstate commerce. All of the gas royalty owners in the Hugoton-Anadarko area have leases with Phillips and a common in-

terest in the money collected by Phillips as "suspense royalties" from the sale of gas in the designated area. It was the same FPC regulation that caused and permitted Phillips to collect the "suspense royalties," and the same FPC Opinion No. 586 pursuant to which the "suspense royalties" were paid out to the royalty owners in the area. All of the gas royalty owners in the Hugoton-Anadarko area have a right in common with each other, in the equivalent of a common fund, to claim damages for commingling and use of the "suspense royalties" by Phillips, payable as interest, and they have a contact with Kansas by reason of such common interest.

Phillips contends the members of the class within the court's jurisdiction are not so numerous as to make their joinder impracticable. Phillips argues only 218 class members are Kansas residents and of this number only 128 signed a gas royalty agreement of the same type under which Althea Shutts was paid her money in December of 1972. Phillips does not indicate, nor does the record disclose, how many gas royalty leases covering Kansas land are involved. In view of what has heretofore been said, there is no need to examine this contention. (However, see *Williams v. Humble Oil & Refining Company,* 234 F. Supp. 985 [E.D. La. 1964] [joinder of 76 persons impracticable]; *Fox v. Prudent Resources Trust,* 69 F.R.D. 74 [E.D. Pa. 1975] [joinder 148 limited partners impracticable]; *Sabala v. Western Gillette, Inc.,* 362 F. Supp. 1142 [S.D. Tex. 1973] [class began with 39 and twelve opted-out]; and *Republic Nat. Bank of Dallas v. Denton & Anderson Co.,* 68 F.R.D. 208 [N.D. Tex. 1975].)

Phillips argues this is not a proper class action case under K.S.A. 60-223(*b*)(1). We think this point is immaterial. The trial court treated it as a K.S.A. 60-223(*b*)(3) class action, despite its class order finding number four which was relevant to a 60-223(*b*)(1) class action.

The appellant contends the trial court erred in holding that Phillips had been unjustly enriched by retaining certain increased proceeds of gas sales, subject to refund under appropriate FPC regulations, until final determination by the FPC of the just and lawful rate for such gas sales.

The trial court awarded interest on the grounds of unjust enrichment as reflected in its tenth conclusion of law, heretofore quoted. The doctrine of unjust enrichment prevents one from

profiting or enriching himself at the expense of another contrary to equity. But there must be some specific legal principle or situation which equity has established or recognized to bring a case within the scope of the doctrine. (*Anderson v. Anderson,* 155 Kan. 69, 72, 123 P.2d 315.)

The appellant contends, and we agree, its retention of the suspense royalties pending FPC determination was lawful. (*Ashland Oil & Refining Company v. Staats, Inc.,* 271 F. Supp. 571 [D. Kan. 1967]; *Boutte v. Chevron Oil Company,* 316 F. Supp. 524 [E.D. La. 1970], aff'd 442 F.2d 1337 [5th Cir. 1971]; and *Phillips Petroleum Company v. Adams,* 513 F.2d 355, 361-362 [5th Cir. 1975], cert. denied 423 U.S. 930, 46 L.Ed.2d 259, 96 S.Ct. 281.) However, that does not mean Phillips owes no interest as a result of the long retention of the FPC "suspense royalties." (*Boutte v. Chevron Oil Company,* supra.)

This identical issue was presented in *Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, 562 P.2d 1. (On June 15, 1977, Mr. Justice White of the United States Supreme Court stayed the mandate of this court in that case.) In *Lightcap,* Mobil was paying gas royalties on the basis of old contract rates of 8.74 cents and 7.15 cents per Mcf while collecting increased rates. Mobil and its predecessors made active use of the plaintiffs' monies collected and plaintiffs were deprived of that use. Although this court was not in complete agreement on other aspects of that opinion, it unanimously held:

"Where a party retains and makes actual use of money belonging to another, equitable principles require that it pay interest on the money so retained and used." (Syl. 12.)

As previously indicated the FPC may order Phillips or any other natural gas companies to refund, with interest, the portion of such increased rates or charges found not justified by the FPC. (15 U.S.C. § 717c[e]; and 18 C.F.R. § 154.102[c].) The rate of interest in the event a refund is ordered is presently seven percent (7%) per annum for all rate filings tendered prior to October 10, 1974. (18 C.F.R. § 154.102[c].)

In the case at bar, beginning on June 1, 1961, Phillips withheld the share of the class members of the increased gas prices subject to refund. Thereafter, while the FPC slowly ground out FPC Opinion No. 586, Phillips deposited the increased rate monies in its general accounts and commingled them with other funds

without giving further notice to the royalty owners. *What is significant is these gas royalty suspense monies never did or could belong to Phillips.* If the FPC disapproved the proposed increase rates the pipeline companies (gas purchasers of Phillips) would receive this suspense money *and the interest which Phillips had agreed to pay by its corporate undertaking.* If the FPC approved the proposed increase rate, the "suspense royalties" would go to the gas royalty owners.

Phillips held a sizable amount of money during this period. On or about December 7, 1972, Phillips mailed approximately $5,700,000 in additional gas royalties due gas royalty owners by virtue of the finality of FPC Opinion No. 586. A case comment on this subject at 54 Tex. L. Rev. 847 (1976) noted:

". . . Phillips had collected $7,500,000 in additional proceeds from the Permian Basin area under FPC Op. No. 662 and currently collects $500,000 per month subject to refund under FPC Op. No. 669, which relates to nationwide rates. Petitioner's Brief for Certiorari at 9, Phillips Petroleum Co. v. Adams, 96 S.Ct. 281 (1975). Five major oil companies paid approximately $4.5 million in suspense money royalties alone (normally one-eighth of the amount paid to lessees) to 16,000 Kansas and Oklahoma owners under the same FPC rate case in *Adams.* Sunday Oklahoman, Jan. 11, 1976, § B, at 2, col. 1. A Kansas state court recently awarded approximately $1.5 million in interest payments to royalty owners. Nix v. Northern Natural Gas Producing Co., No. 3116 (Dist. Ct. Grant County, Kan., Jan. 8, 1976). The potential problems grow daily as the FPC encourages the filing of rate increases to provide an incentive to increase the supply of natural gas. . . ." (fn. 54, pp. 856-857.)

Furthermore, Phillips did not permit the suspense royalty money collected to remain idle. O. W. Armstrong, Treasurer of Phillips Petroleum Company, testified in part as follows:

". . . Phillips' short term investments ranged from 89.7 million dollars in 1964 up to 338.5 million dollars in 1972. . . Phillips' total assets went up from $1,806,000,000.00 in 1963, to $3,269,000,000.00 in 1972, with the exception of 1970 when there was a slight drop. . . Cash in excess of a given amount would be surplus cash and is invested. . . the approximately $6,000,000.00 in F.P.C. suspense money was a part of Phillips' cash, . . . all of Phillips' cash being in one pot, . . . not segregated for any purpose. . . ."

Phillips made substantial profit during the years 1961-1973. The net profit ranged from $113,000,000 to $132,000,000 during the period in question and stockholders' equity increased from $1,205,000,000 in 1962 to over $1,749,000,000 in 1971.

Phillips' use of the "suspense royalties" was clearly a sound and profitable business practice. We cannot condemn Phillips for

using this money because this was apparently not repugnant to the FPC regulatory scheme, or repugnant to Phillips' contractual relations with the gas purchasers under federal case law. Nor do we condemn Phillips for the FPC delay. However, we do not believe that Phillips may enrich itself in the absence of any contractual sanction or seize upon the procedural complexities of the FPC to avoid responsibility for an appropriate measure of damages, expressed in terms of interest. In *Shapiro v. Kansas Public Employees Retirement System,* 216 Kan. 353, 357, 532 P.2d 1081, the court enunciated the following general principle:

"Interest has been defined as the compensation allowed by law or fixed by the parties for the use, detention, or forbearance of money. In our society today money is a commodity with a legitimate price on the market and loss of its use, whether occasioned by the delay or default of an ordinary corporation, citizen, state or municipality should be compensable."

(See also *Lightcap v. Mobil Oil Corporation,* supra at 468-469.)

In passing we also note a long line of federal cases have concluded Texas law permits—and equity requires—the award of interest on suspense royalties under similar circumstances. (*Phillips Petroleum Company v. Adams,* 513 F.2d 355, 365 [5th Cir. 1975], cert. denied, 423 U.S. 930, 46 L.Ed.2d 259, 96 S.Ct. 281; *First Nat. Bank of Borger v. Phillips Petroleum Co.,* 513 F.2d 371 [5th Cir. 1975], cert. denied, 423 U.S. 930, 46 L.Ed.2d 259, 96 S.Ct. 281; *Phillips Petroleum Co. v. Riverview Gas Compression Company,* 513 F.2d 374 [5th Cir. 1975], cert. denied, 423 U.S. 930, 46 L.Ed.2d 259, 96 S.Ct. 281; *Phillips Petroleum Co. v. Hazlewood,* 534 F.2d 61 [5th Cir. 1976]; *Fuller v. Phillips Petroleum Co.,* 408 F. Supp. 643 [N.D. Tex. 1976]; and *Phillips Petroleum Co. v. Hazlewood,* 409 F. Supp. 1193 [N.D. Tex. 1975].)

In addition, the Texas Civil Court of Appeals recently awarded interest on suspended royalties in *Stahl Petroleum Co. v. Phillips Petroleum Co.,* 550 S.W.2d 360 (Tex. Civ. App. No. 8762, filed April 6, 1977.) This case also arises out of the Hugoton-Anadarko area and the issuance of FPC Opinion No. 586. While recognizing *Phillips Petroleum Company v. Adams,* supra, the Texas Civil Court of Appeals relied on the terms of the *royalty agreement* and the Texas interest statute, rather than unjust enrichment, to require the payment of prejudgment interest on the suspended royalties.

An examination of the royalty agreement set forth in the record herein reveals the lessee (Phillips) contracted to pay and the lessor (royalty owner) contracted to receive a percentage of the "weighted average price per Mcf received by lessee from all sales of gas delivered within" a designated area during any calendar month. While the term "received" is not defined in the contract, giving the term its ordinary meaning, Phillips expressly contracted to pay a percentage of the *price received* for the sale of gas on which month-by-month payments to the royalty owner were to be based. Although the money received by Phillips for the sale of gas in excess of the established rates pending FPC determination was subject to possible refund, *none of the excess was contractually excluded from the price received by Phillips and on which payment to the royalty owner was contractually based.* There was no rule or regulation which prohibited Phillips from including the excess in the amount on which calculation of payment to the royalty owner on a month-to-month basis was made. (*Stahl Petroleum Co. v. Phillips Petroleum Co.,* supra.) But if Phillips chose to withhold payments of contractually owing "suspense royalties" pending FPC approval, as authorized by prior federal case law, that did not relieve Phillips of its contractual obligation to pay the *price received* with interest for the period of time the suspense money was held and used by Phillips.

Oklahoma has no decision allowing interest on "suspense royalties." However, several Oklahoma decisions hold that interest may be awarded on equitable grounds where necessary to arrive at a fair compensation. (*Smith v. Owens,* 397 P.2d 673 [Okla. 1963]; and *First Nat. Bank & T. Co. v. Exchange Nat. Bank and T. Co.,* 517 P.2d 805 [Okla. App. 1973].)

Furthermore, the United States Supreme Court has noted the imposition of interest on refunds ordered by the FPC is not an inappropriate means of preventing unjust enrichment. (*United Gas v. Callery Properties,* 382 U.S. 223, 15 L.Ed.2d 284, 86 S.Ct. 360.)

Based on the foregoing authorities we hold in this case that interest on suspended royalties may be recovered for the period of time such royalties remained in the control of, and were available for use by, the gas producer (Phillips) during the pendency of FPC proceedings and related litigation regarding the determination of applicable lawful rates for gas sales, and litigation regarding the determination of issues involved in this appeal.

Having determined that interest can be awarded, the question becomes what rate of interest should be applied. The district court found:

"The statutory rate of interest herein in Kansas, Oklahoma and Texas is six per cent per annum and is allowed as the proper rate of interest to be applied to the suspended royalties herein from time of receipt until date of judgment herein with interest compounded on an annual basis."

Phillips contends the trial court erred in holding that under the facts in this case it was proper to award compound interest. It argues a (legal) (statutory) rate of six percent (6%) simple interest must apply under the laws of Kansas, Texas and Oklahoma.

The appellee has cross-appealed contending the trial court erred in failing to consider inflation rates and profits so as to place the owners at least on a par with gas purchasers.

In *Lightcap v. Mobil Oil Corporation,* supra, this court resolved the matter. There the court noted:

"Here Mobil and its predecessor made active use of plaintiffs' money, and plaintiffs were deprived of that use. Under the reasoning of the foregoing cases plaintiffs are entitled to be compensated for their loss. Mobil was obligated by FPC order to pay Northern 6% interest on Northern's share of the 'impounded' money; *equitable principles require that the royalty owners receive the same treatment as to their share. . . .*" (p. 469.) (Emphasis added.)

In the instant case Phillips was obligated by FPC order to pay gas purchasers seven percent (7%) until September 18, 1970, and thereafter eight percent (8%) interest on the gas purchasers' share of the suspense monies. Here equitable principles require, and contractual principles dictate, that the royalty owners receive the same treatment as to their share.

Phillips cites the interest laws of Kansas, Texas and Oklahoma. K.S.A. 16-201 provides:

"Creditors shall be allowed to receive interest at the rate of six percent per annum, *when no other rate of interest is agreed upon,* for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the same and ascertaining the balance; for money received for the use of another, and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forebearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their day or monthly employees, from and after the end of each month, unless the same shall be paid within fifteen days thereafter." (Emphasis added.)

Texas Rev. Civ. Stat., Art. 5069-1.03 (1971) states:

*"When no specified rate of interest is agreed upon by the parties,* interest at the rate of 6% per annum shall be allowed on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable; and on all open accounts, from the first day of January after the same are made." (Emphasis added.)

Oklahoma Stat., tit. 15, § 266 (1966) states:

"The legal rate of interest shall not exceed six per cent *in the absence of any contract* as to the rate of interest, and by contract, *parties may agree upon any rate* not to exceed ten per cent per annum. Said rates of six and ten per cent shall be respectively, the legal rate and the maximum contract rates of interest." (Emphasis added.)

All these statutes refer to situations where there is no agreement as to the rate of interest. Here that situation does not exist.

We are dealing with "suspense royalties" which never could or would belong to Phillips. This was the equivalent of a common fund which was accumulated and used by Phillips. After the FPC Opinion No. 586 was announced the monies accumulated by Phillips in this fund were later divided between the gas purchasers and the gas royalty owners. In other words, Phillips was a stakeholder who retained the fund which it used for its own benefit. (See *Phillips Petroleum Company v. Adams,* supra.) What justified the payment of seven percent (7%), and later eight percent (8%), interest on part of this common fund which Phillips *expressly contracted and agreed to pay* to the gas purchasers, while paying only six percent (6%) interest to the gas royalty owners, is impossible to discern. If the FPC had denied all of Phillips' rate increase applications, Phillips would have had to pay seven percent (7%), and later eight percent (8%), interest to the gas purchasers *pursuant to its express agreement and corporate undertaking with the FPC. Thus, Phillips has made an express agreement,* with regard to the monies accumulated in the suspense fund by Phillips, *to pay seven percent (7%), and later eight percent (8%) interest,* as ultimately determined by the FPC Opinion No. 586.

Due to limitations on the FPC jurisdiction, it could not provide in its order that interest be paid to the gas royalty owners. (*Mobil Oil Corporation v. Federal Power Commission,* 463 F.2d 256 [D.C. Cir. 1972], cert. denied, 406 U.S. 976, 32 L.Ed.2d 676, 92 S.Ct. 2413; and *Lightcap v. Mobil Oil Corporation,* supra at 470,

471.) However, the FPC did require Phillips to agree to pay interest on the suspense monies they held, which agreement the members of the plaintiff class herein assert as an appropriate measure of damages, expressed in terms of interest, for the commingling and use of the suspense monies by Phillips.

This answers Phillips' contention that *Columbian Fuel Corp. v. Panhandle Eastern Pipe Line Co.,* 176 Kan. 433, 271 P.2d 773 and other cases prevent the payment of interest on unliquidated sums. In *Columbian Fuel* an interim rate increase was approved by the Kansas Corporation Commission on natural gas sold to the buyer. The buyer was permitted to withhold the increase upon securing a bond. The seller brought suit seeking to collect interest on the amount withheld. This court noted the temporary nature of the Kansas Corporation Commission order and disallowed interest. The court held:

"In the absence of an agreement therefor interest may not be recovered on a claim as long as the validity of the claim is unadjudicated and the amount on which interest could be computed, if the claim be declared valid, remains wholly uncertain and unliquidated." (Syl. 5.)

Here, of course, an agreement for the payment of interest on the part of Phillips is clearly present. Further, the suspended payments in *Columbian Fuel* did not necessarily belong to another. Here the "suspense royalties" belong either to the royalty owners or the pipeline companies. Thus we reaffirm our decision in *Lightcap,* supra at 466, distinguishing *Columbian Fuel.*

Having determined that seven percent (7%), and later eight percent (8%), interest can be awarded, we must determine whether the actions of the royalty owners have waived their right to interest. The appellant contends the trial court erred in holding that the plaintiff class, by refusing to accept the increased proceeds from gas sales from Phillips under an obligation to refund the same, if Phillips was ultimately obligated to do so, did not waive any claim to interest on such proceeds, or were not estopped from making such claim.

Phillips relies on its July 1961, notice sent to Althea Shutts and all other royalty owners in the Hugoton-Anadarko area which provided in pertinent part:

"Interest owners desiring to receive payments computed currently on the full sums being collected may arrange to do so by furnishing Phillips Petroleum Company acceptable indemnity to cover their proportionate part of any required refunds, plus the required interest."

The seventeen royalty owners who accepted Phillips' offer to reimburse Phillips with interest for any "suspense royalties" which the FPC might require Phillips to refund to the gas purchasers are not members of the plaintiff class. Phillips contends it would be inequitable under these circumstances to require it to now pay interest to these royalty owners who refused to accept the money under the same risk Phillips undertook.

Where, as here, Phillips has expressly contracted to pay a percentage of the *price received* for the sale of gas on which month-by-month payments to royalty owners were to be based, and the amount received by Phillips for the sale of gas in excess of the established rates pending FPC determination, although subject to possible refund, was not contractually excluded from the *price received,* Phillips is in no position to unilaterally impose burdensome conditions upon the royalty owners precedent to fulfilling its contractual commitment albeit permissive until final FPC approval of rate increase applications. Furthermore, the notices sent by Phillips to its gas royalty owners indicated Phillips was not unduly concerned with security for the possible return of "suspense royalties" paid out. The notice sent royalty owners by Phillips on or about November 25, 1970, *informed* royalty owners it was giving effect to full ceiling rate levels established by FPC Opinion No. 586 in the payment of royalty, although the opinion had not become final. In the notice Phillips further informed royalty owners it would expect reimbursement in full for any overpayments resulting in the reduction of levels relied upon should there be a change in the FPC Opinion No. 586, and that Phillips would withhold from subsequent payments of royalty on gas or oil, or both, at its election, any overpayment occasioned thereby. The royalty owner was told acceptance of the check would constitute consent to such recovery of overpayments.

It is apparent Phillips' previous imposition of burdensome conditions upon royalty owners for payment of royalty at ceiling rate levels pending FPC approval of gas rate increases, was designed to accomplish precisely what the facts disclose. Virtually none of the royalty owners complied with the conditions, thereby leaving the "suspense royalties" in the hands of Phillips as stakeholder to use at its pleasure in the operation of its business over the long period of time the FPC retained jurisdiction over Phillips' rate increase applications.

Under the circumstances we have no hesitance in holding that the royalty owners in the plaintiff class did not waive any claim to interest on "suspense royalties" held by Phillips, by declining to honor the burdensome conditions unilaterally imposed by Phillips for their monthly payment. For the same reasons the royalty owners are not estopped to assert their claim in this action. Phillips' assertion of equity, by arguing it would be inequitable to require Phillips to now pay interest to these persons who refused to accept the money under the same risk that Phillips held it, is not impressive. It distorts the facts and ignores Phillips' admissions. The conditions imposed by Phillips were far more stringent than the corporate undertaking Phillips filed with the FPC.

Phillips argues when the plaintiff class members accepted the December 7, 1972, payment of suspense royalties and negotiated Phillips' checks, this extinguished the debt and any right that might have existed to sue for interest thereon, and that the trial court erred in holding to the contrary. Phillips alleges they do not rely on accord and satisfaction or an estoppel, but rather on the rule that payment of the principal sum is a legal bar to a subsequent action for interest.

The notice Phillips unilaterally mailed to all of its royalty owners on or about December 7, 1972, enclosing checks, to cover payment based upon gas proceeds previously held in suspense, said nothing about interest or how long the money had been held or used by Phillips. However, as previously indicated, Phillips is liable for interest on these suspense royalty funds which it retained as a stakeholder and used in the operation of its business. The payment of these funds to the plaintiff class members, instead of extinguishing the debt, constituted only a partial payment on an interest-bearing debt. This situation invokes application of the so-called "United States Rule," which provides that in applying partial payments to an interest-bearing debt which is due, in the absence of an agreement or statute to the contrary, the payment should be first applied to the interest due. (45 Am. Jur. 2d, Interest and Usury, § 99, pp. 88-89; and 47 C.J.S., Interest, § 66, pp. 72-73.)

Kansas approved this rule in *Christie v. Scott,* 77 Kan. 257, 94 Pac. 214, in determining appellate jurisdiction, and cited the rule with approval in *Jones v. Nossaman,* 114 Kan. 886, 221 Pac. 271, 37 A.L.R. 317.

The "United States Rule" is also followed in Oklahoma and Texas. (*Landess v. State*, 335 P.2d 1077 [Okla. 1958]; *Straus v. Brooks*, 126 S.W.2d 542 [Tex. Civ. App. 1939], rev'd on other grounds, 136 Tex. 141, 148 S.W.2d 393 [Com. App. 1941]; and *J. I. Case Co. v. Laubhan*, 64 S.W.2d 1079 [Tex. Civ. App. 1933].)

Thus, we conclude, acceptance of the so-called "principal sum," by the royalty owners is not a bar to their claim in this case. Phillips raised and lost a similar argument in *Phillips Petroleum v. Riverview Gas Compression Co.*, 409 F. Supp. 486 (N.D. Tex. 1976), the sequel to *Phillips Petroleum Co. v. Adams*, supra.

In the exercise of equitable powers our court has refused to bar relief under theories of ratification, waiver or estoppel where one due to unequal bargaining power or knowledge accepts a check in reliance on a fraudulently induced impression by the payor. (*Prather v. Colorado Oil & Gas Corp.*, 218 Kan. 111, 542 P.2d 297; and cases cited therein.)

Phillips argues the Oklahoma class members are not entitled to recovery by reason of Okla. Stat. Ann., tit. 23, § 8 (1951), which provides: "Accepting payment of the whole principal, *as such,* waives all claim to interest." In the instant case there is no indication the principal was accepted, *as such.* We further note Oklahoma has not strictly construed this statute. (*Webster Drilling Co. v. Sterling Oil of Oklahoma, Inc.*, 376 P.2d 236 [Okla. 1962].)

An identical statute in California was said to be a rule of construction to be applied between parties dealing at arm's length, where their agreement is to be inferred from the fact that the principal is tendered and accepted, and the statute was held to have no application where the conditions of payment are such that the creditor has no opportunity to assert his claim for interest at the time of payment. (*McConnell v. Pacific Mutual Life Ins. Co.*, 205 Cal. App. 2d 469, 24 Cal. Rptr. 5 [1962].) Here the individual class members had no practical opportunity to assert their claim for interest under the circumstances of Phillips' payout.

We therefore hold on equitable principles Phillips is required to pay its royalty owners herein seven percent (7%) per annum simple interest on suspense royalties from the date of receipt of suspense royalties by Phillips until October 1, 1970 (the effective date of FPC Opinion No. 586), and eight percent (8%) simple

interest per annum thereafter until the payout to the royalty owners on or about December 7, 1972. Applying the "United States Rule" on partial payments, after the payout there was still an unpaid principal sum due equal to the total principal due plus accrued interest, less the payout. Assuming proper calculations, this amount, although principal, would equal the accrued interest on the date of the payout. From December 7, 1972, on until the date of judgment (July 29, 1976) equitable principles and Phillips' contractual undertaking require Phillips to pay its royalty owners herein eight percent (8%) per annum simple interest on the unpaid principal sum (accrued interest on date of payout) plus the unpaid principal sum; and thereafter our post-judgment interest statute, K.S.A. 16-204, requires payment of eight percent (8%) per annum simple interest for the benefit of the royalty owners on the total amount of the judgment until paid.

Accordingly, the judgment of the lower court is affirmed in part and modified in part, and the case is remanded for further proceedings consistent with the foregoing opinion.